# EXHIBIT I

1

1

2    UNITED STATES DISTRICT COURT
     EASTERN DIVISION OF NEVADA
3    -------------------------------------X

4    ADELE SAMMARCO,

5                          Plaintiff,    Case No.
                                         02.CIV.6239
6          - against -                   (SJ)(JMA)

7    NEW YORK 1, PETER LANDIS, STEVE PAULUS,
     ELISABETH FANFANT,
8
                         Defendants.
9
     -------------------------------------X
10

11

12        EXAMINATION BEFORE TRIAL of the

13   Defendant, NEW YORK 1, by GARY ANTHONY

14   RAMSAY, held at the law offices of JOSEPH

15   TACOPINA, P.C., 275 Madison Avenue, New

16   York, New York, on October 27, 2006,

17   commencing at 10:30 a.m., before Sonya Owen,

18   a Shorthand Reporter and Notary Public

19   within and for the State of New York.

20

21

22

23              REINIG REPORTING, INC.
                192 Lexington Avenue
24                  Suite 802
              New York, New York  10016
25               (212) 684-7298

☐

2

```
 1

 2   A P P E A R A N C E S :

 3

 4   LAW OFFICES OF JOSEPH TACOPINA, P.C.
     Attorneys for Plaintiff
 5        275 Madison Avenue
          New York, New York 10016
 6
     BY:   JOSEPH TACOPINA,, ESQ.
 7              -and-
          ANDREW C. LAUFER, ESQ.
 8

 9

10

11   KAUF, McCLAIN & McGUIRE, LLP
     Attorneys for Defendants
12        950 Third Avenue
          New York, New York  10022
13
     BY:   KENNETH A. MARGOLIS, ESQ.
14

15

16

17   ALSO PRESENT:

18        ABBY F. STRAUSS, ESQ.

19        ADELE SAMMARCO

20

21

22

23

24

25
```

```
 1
 2                S T I P U L A T I O N S
 3
 4          IT IS HEREBY STIPULATED AND AGREED by
 5     and between the attorneys for the respective
 6     parties hereto that the sealing, filing and
 7     certification of the transcript of the within
 8     examination before trial be, and the same
 9     hereby are waived.
10
11          IT IS FURTHER STIPULATED AND AGREED
12     that said transcript may be signed and sworn
13     to before any Notary Public or Commissioner
14     of Deeds with the same force and effect as if
15     signed and sworn to before an officer of this
16     Court.
17
18          IT IS FURTHER STIPULATED AND AGREED
19     that all objections, except as to the form of
20     the questions, are reserved to the time of
21     the trial.
22
23
24
25
```

```
 1
 2   G A R Y   A N T H O N Y   R A M S A Y,
 3                    called as a witness, having
 4                    been first duly sworn, was
 5                    examined and testified as
 6                    follows:
 7
 8   EXAMINATION BY MR. TACOPINA:
 9        Q    State your name for the record,
10   please.
11        A    Gary Anthony Ramsay.
12        Q    Your address, please?
13        A    75 Ninth Avenue, New York, New
14   York  10011.
15        Q    Good morning, Mr. Ramsay.
16        A    Good morning.
17        Q    Where are you currently employed?
18        A    New York 1 News.
19        Q    What capacity?
20        A    I am the weekend anchor and
21   breaking news reporter.
22        Q    How long have you been at New
23   York 1 News?
24        A    Since 1992.
25        Q    What position were you hired to
```

```
 1                    G. Ramsay
 2    fulfill in 1992?
 3         A     Queens reporter.
 4         Q     Who is your immediate supervisor
 5    currently?
 6         A     My immediate supervisor is Bernie
 7    Han.
 8         Q     What is his title?
 9         A     It is Bernadette Han.  She is the
10    news director.
11         Q     So she is the current news
12    director?
13         A     Her title is bigger than that,
14    but that is what she does.
15         Q     Mr. Ramsay, have you ever been
16    arrested?
17         A     Yes.
18         Q     When was that?
19         A     I believe it was 2000, the fall
20    of 2000.
21         Q     Was that a baseball game or
22    something?
23         A     No.
24         Q     Where was that?
25         A     It was in lower Manhattan.
```

6

```
 1                    G. Ramsay

 2    Disorderly conduct charge.

 3         Q    Were you working at the time?

 4         A    Was I on the job?

 5         Q    Were you on duty at the time?

 6         A    No.

 7         Q    What happened with that case?

 8    Was it resolved?

 9         A    It was dismissed.

10         Q    That was the only time you have

11    been arrested?

12         A    No.

13         Q    When else?

14         A    When I was in college.

15         Q    What was that for?

16         A    Failure to turn in a cable box

17    essentially.

18         Q    Did you serve many years in jail

19    for that?

20         A    No, no.

21         Q    Were you arrested in 2000 during

22    the Yankee Mets subway series game?

23         A    No.

24         Q    Did you have an altercation with

25    a police officer at that point, at one of
```

7

```
1                    G. Ramsay

2      these subway series games?

3          A     No.

4          Q     Do you know who -- I may not be

5      pronouncing it correctly, Bashe Warner is?

6          A     Yes.

7          Q     Who is he?

8          A     Bashe Warner was a photographer

9      at New York 1.

10         Q     Was he initially an intern for

11     you?

12         A     Yes.

13         Q     What was your relationship like

14     with Bashe Warner?

15         A     We were close.

16         Q     Did you ever discuss Adele

17     Sammarco to Bashe Warner?

18         A     Not that I can recall.  Maybe.

19     Probably only relative to a story or whatever.

20         Q     Did you discuss Adele Sammarco

21     in a sexually explicit manner with Bashe

22     Warner?

23         A     Not that I can recall.

24         Q     Not that you recall?

25         A     No.
```

8

```
 1                    G. Ramsay

 2          Q     What happened to Bashe Warner?

 3    Is he still at New York 1?

 4          A     No, he is not.

 5          Q     Did he get fired?

 6          A     Yes.

 7          Q     Do you know why?

 8          A     I am not -- I wasn't -- I can't

 9    tell you why they fired him.

10          Q     Did he ever express to you why he

11    was fired?

12          A     Yes.

13          Q     What did he tell you?

14          A     He said he was accused of

15    stealing a camera or assisting in stealing.

16          Q     Sir, I am going to jump right

17    into a particular date, July 29, 2000.  Do you

18    recall being at a party at Cafe Iguana on that

19    date?

20          A     I recall being at a party in Cafe

21    Iguana in that year, but I don't recall the

22    particular date.

23          Q     Is that the party where you drove

24    Adele Sammarco home?

25          A     Yes, that's correct.
```

```
1                    G. Ramsay
2         Q     By the way, before we get into
3    the specifics of that drive from the Cafe
4    Iguana party to Adele Sammarco's house, are
5    you familiar with a clause in your contract
6    that deals with codes of conduct?
7         A     Yes, I am.
8         Q     What do you recall that clause
9    stating?
10        A     Without getting into it word for
11   word, essentially that New York 1 can
12   discipline me for things that bring them into
13   a negative light that happen.
14        Q     That brings New York 1 into a
15   negative light?
16        A     Or myself.
17        Q     Have you ever violated, in your
18   opinion, that code of conduct?
19        A     No.
20        Q     Where did you drive Ms. Sammarco
21   after that Cafe Iguana party to in July of
22   2000?
23        A     She said she was staying with a
24   friend.  I don't remember the street.
25        Q     Do you remember what borough?
```

[]

```
 1                   G. Ramsay

 2        A     In Manhattan.

 3        Q     When you got to the location

 4   where Ms. Sammarco got out, did you hold her

 5   in your car?  Did you make physical contact

 6   with her?

 7              MR. MARGOLIS:  Which question are

 8         you asking, because you asked two

 9         questions there?

10        Q     Here is the question:  Before she

11   got out of the car did you make physical

12   contact with her?

13        A     I may have, yes.

14        Q     Describe that, if you would.

15        A     I may have leaned over and kissed

16   her good night.

17        Q     You may have leaned over and

18   kissed her good night, okay.

19              Did you place your tongue down

20   her throat in kissing her good night?

21        A     No.

22        Q     Did you have a sexual

23   relationship with Ms. Sammarco at the time?

24        A     No.

25        Q     Were you dating?
```

☐

11

```
 1                         G. Ramsay
 2          A      No.
 3          Q      Were you social friends?
 4          A      No.
 5          Q      But you felt the need to kiss her
 6     good night on that particular evening?
 7          A      Well, it was a peck on the cheek
 8     I am sure.
 9          Q      A peck on the cheek.  Had you
10     pecked Ms. Sammarco on the cheek before?
11          A      I have.
12          Q      Do you peck the female reporters
13     or employees of New York 1 on the cheek when
14     you are leaving or when you are parting ways
15     with them?
16          A      Pardon me.
17          Q      Do you peck female employees of
18     New York 1 on the cheek when you are parting
19     ways with them?
20          A      All of them or any of them?
21          Q      Any of them.
22          A      I have.
23          Q      Who?
24          A      Those who are my friends,
25     personal friends.
```

☐

```
 1                    G. Ramsay      2671

 2         Q     Who is that?

 3         A     Now or then?

 4         Q     Let's start with then.

 5         A     I couldn't give you a specific

 6    list.

 7         Q     Could you give me one name other

 8    than Adele Sammarco?

 9         A     Debbie Ferrick.

10         Q     You would peck Debbie Ferrick on

11    the cheek when you left?

12         A     Not all of the time.

13         Q     Did you wrap your arms around

14    Ms. Sammarco in the car that night?

15         A     No.

16         Q     Did you fondle Ms. Sammarco in

17    any way?

18         A     No.

19         Q     So did your arms or hands touch

20    her body?

21         A     I don't think so, no.

22         Q     So what is the physical contact

23    that you said you may have had with

24    Ms. Sammarco in that car that night in 2000?

25         A     As I already said, I leaned over
```

 

```
 1                    G. Ramsay
```

2      and probably kissed her on the cheek.

3          Q      Why did you feel it was

4      appropriate to kiss Ms. Sammarco on the cheek

5      that night in the car?

6          A      We had been -- if I recall, we

7      had been talking about some New York 1 job

8      related stuff.  It was, I guess, stuff that we

9      both felt the same about in terms of the job.

10         Q      Like what?  What were you talking

11     about?

12         A      Frustrations, day-to-day

13     frustrations with any number of things.  The

14     assignment desk, resources.

15         Q      You were frustrated with the

16     assignment desk?

17         A      At the time?

18         Q      Yes.

19         A      Yes.

20         Q      What in particular were you

21     frustrated about?

22         A      It was just one big story

23     sometimes or even moderate stories or just you

24     didn't get any help.  You were out there by

25     yourself a lot.

□

14

1              G. Ramsay

2        Q      You raised that or she raised

3    that as an area of frustration and you both

4    seemed to come to the same consensus and

5    agreement that it was frustrating?

6        A      Yes.

7        Q      Because of that you felt the need

8    to kiss her on the cheek when she left?

9        A      I couldn't exactly describe it as

10   a need.  It is just something that happened.

11       Q      You formed a desire to kiss her

12   on the cheek because you both agreed that New

13   York 1 was frustrating you?

14       A      No.  I would say that although

15   Adele and I weren't social friends we at one

16   time shared the same set of cubicles and often

17   had random discussions about a number of

18   things.

19       Q      So because of that you formulated

20   this desire to kiss her on the cheek?

21              MR. MARGOLIS:  I will object.  He

22          hasn't testified he formulated a desire

23          of any kind.

24       Q      Did she ask you, Mr. Ramsay, to

25   kiss her on the cheek when she was getting out

☐

15

1                G. Ramsay

2    of the car?

```
 3      A     She did not ask me.

 4      Q     Did you on your own decide to

 5  kiss her on the cheek?

 6      A     I don't think it was a decision I

 7  made by myself, because she leaned back and we

 8  separated.

 9      Q     Let's take that slowly.  She

10  leaned back as in away from you?

11      A     Leaned forward.

12      Q     When you say lean forward --

13      A     When I say back, I mean back

14  towards me.

15      Q     Who made the first move,

16  Mr. Ramsay?

17      A     I can't recall.

18      Q     So she may have leaned forward to

19  you looking for a kiss and you just wanted to

20  accommodate her; is that a possibility?

21      A     It is a possibility, yes.

22      Q     Really, it is your testimony that

23  when you went to kiss her on the cheek she

24  leaned forward to make it easier for you to

25  kiss her?
```

16

```
 1              G. Ramsay

 2      A     Yes.
```

2675

3     Q     When did you decide you were

4   going to kiss her on the cheek?

5     A     Like I said, I didn't make a

6   decision it was going to happen.  It is not

7   something I thought about during the course of

8   the drive.

9     Q     When did you come to the decision

10  that you were going to kiss her on the cheek?

11            MR. MARGOLIS:  I will object.  He

12        just testified he didn't make a

13        decision on this.  He just testified he

14        didn't make a decision during the

15        course of the drive.

16            MR. TACOPINA:  Your objection is

17        noted.

18    Q     Please answer the question.  When

19  did you come to that decision you were going

20  to kiss her on the cheek?

21    A     As I was saying good night.

22    Q     After you came to that decision

23  and you kissed her as you say on the cheek,

24  now it is your testimony under oath you didn't

25  put your tongue down her throat?

☐

17

1               G. Ramsay

2     A     That's right.

3     Q     Is it your testimony under oath

4    you didn't hold her neck in place when you

5    kissed her?

6         A    That's correct.

7    ·    Q    It is your testimony that you

8    didn't use your arms to hold her down in your

9    car?

10        A    That's correct.

11        Q    What did she say to you after you

12   kissed her on the cheek because you shared the

13   same cubicles?

14        A    Excuse me.

15        Q    What did she say after you kissed

16   her on the cheek?

17        A    Good night.

18        Q    Now, Boshe Warner, did you ever

19   discuss this incident, the sudden urge you had

20   to kiss Adele Sammarco, the kiss with Bashe

21   Warner?

22             MR. MARGOLIS:  Objection.

23             MR. TACOPINA:  I will rephrase

24        it.

25        Q    Did you ever discuss your kissing

[]

18

1              G. Ramsay

2    Ms. Sammarco on the cheek in your car after

3    the Cafe Iguana party with Bashe Warner?

```
 4      A    I may have.           2677
 5      Q    What did you say to him?
 6      A    That Adele accused me of groping
 7  and fondling her in my car.
 8      Q    What did you say to him about
 9  that?
10      A    What did I say to him about that?
11      Q    What was your response to what
12  the accusations were when you did tell Bashe
13  Warner what you had done?
14      A    As I recall, I told him it was
15  ridiculous and that I was pissed.
16      Q    You were pissed?
17      A    Yes.
18      Q    Did you keep a little black book
19  of female interns who worked for you at New
20  York 1?
21      A    No.
22      Q    You never had a black book with
23  all of the female interns' names and phone
24  numbers?
25      A    No.
```

                                                    19

```
 1              G. Ramsay
 2      Q    Prior to this 2000 Cafe Iguana
 3  party and this car ride, did you sexually
 4  assault a female intern at New York 1?
```

```
 5        A      No.

 6        Q      Was there ever an allegation made

 7   against you that you assaulted a female intern

 8   at New York 1?  It is the first you are

 9   hearing about it?

10        A      Yes, absolutely.

11        Q      You later learned that a

12   complaint was filed against you by

13   Ms. Sammarco in the car that night for your

14   conduct; is that correct?

15        A      Yes.

16        Q      Did Elisabeth Fanfant ever speak

17   to you about Adele Sammarco?

18        A      Yes.

19        Q      About that complaint?

20        A      Yes.

21        Q      Elisabeth Fanfant was the human

22   resources manager?

23        A      Yes.

24        Q      What did she tell you?  What did

25   she say to you about this allegation?
```

20

```
 1                G. Ramsay

 2        A      That Adele had -- now that Adele

 3   had filed a complaint -- in thinking back I am

 4   not sure if it was Ms. Fanfant or somebody
```

```
 5    else from human resources.       2679

 6          Q     Do you recall someone from human

 7    resources talking to you about the complaint?

 8          A     Yes.

 9          Q     What did they say to you?

10          A     That Adele had filed a complaint

11    against the company regarding this incident

12    that supposedly happened in my car and along

13    with some other stuff she was bringing up

14    against the company.

15          Q     What did you say to them, this

16    human resources person that you spoke with?

17          A     That I was shocked.  I was angry,

18    but more sad than -- like questioning why

19    would she say something like that.

20          Q     Did they ever tell you that

21    perhaps it wasn't appropriate for you to reach

22    over and kiss a fellow employee?  Did they

23    discuss that with you, anyone from human

24    resources?

25          A     Did anybody ever discuss with me
```

☐

21

```
 1                  G. Ramsay

 2    at what point?

 3          Q     At any point after the allegation

 4    was made.

 5          A     No.
```

6          Q          They never told you that?

7          A          They never said to me it is

8    inappropriate for you to have physical contact

9    with other female employees at New York 1

10   outside of the premises.

11         Q          They never told you that it was

12   inappropriate for you to take it upon yourself

13   to kiss a female employee at New York 1?   They

14   never instructed you about that?

15         A          They have said that it is

16   inappropriate to have physical contact with

17   employees at New York 1 during your work time.

18         Q          In particular did Landis, Peter

19   Landis, give you any instructions with regard

20   to your conduct after Adele Sammarco's

21   complaint was lodged?

22         A          Not that I recall.

23         Q          You don't recall.

24                    Did you discuss Adele Sammarco's

25   complaint with Peter Landis?

☐

22

1                    G. Ramsay

2          A     I did.

3          Q     What did he tell you?

4          A     He told me that Adele Sammarco

5    had filed a complaint and that these are her

6   allegations and it is a part of a long list of

7   other allegations against New York 1.  He

8   asked me if it happened.

9        Q    So he confronted you with her

10  allegations and then told you about other

11  allegations unrelated to you that Adele was

12  making?

13       A    They didn't say what those

14  allegations were.  They said they were a part

15  of a group, a list of allegations that were

16  made against the company.

17       Q    Did you ever discuss the

18  allegations that Adele made with Steve Paulus?

19       A    Only in the same vain.

20       Q    Are you aware of the conclusion,

21  the findings that were made by the powers to

22  be, management, that investigated this claim

23  made by Adele Sammarco against you?

24            MR. MARGOLIS:  I will object.  He

25       hasn't testified to any investigation

☐

                                                23

1                    G. Ramsay

2        nor is there any foundation to ask him

3        about that.

4        Q    Do you know if they did an

5   investigation into Adele's claim or did they

6   dismiss it?

7              MR. MARGOLIS:   I will object at

8         this point.  Apparently it is being

9         investigated as part of a legal claim,

10        so I think it is a matter of work

11        product.

12             MR. TACOPINA:  Your objection is

13        noted.

14        Q    Please answer the question.  Were

15   you aware of an investigation that was

16   commenced by management at New York 1 based

17   upon Adele's claim against you?

18        A    Yes, I was.

19        Q    As part of that investigation you

20   were interviewed; is that correct?

21        A    Yes.

22        Q    Did you later learn the findings

23   of that investigation?

24        A    I guess the answer to that is

25   yes.

24

1                   G. Ramsay

2        Q    What is your understanding as to

3   what the findings were?

4        A    They found it unfounded.  Her

5   allegation was unfounded.

6        Q    It is your understanding they

```
 7    found her allegations unfounded 2683

 8         A    I was never presented with a

 9    document or set -- or brought into an

10    interview to be given the formal results of

11    any investigation.

12         Q    Did you have a chance to read the

13    deposition testimony of Peter Landis?

14         A    I did not.

15         Q    Steve Paulus?

16         A    No.

17         Q    I will be clear when I say the

18    deposition testimony.  I mean the deposition

19    testimony that was taken in this litigation

20    prior to your deposition here today.

21         A    No.

22         Q    Has anyone told you that they

23    came to the conclusion that you made a pass at

24    Ms. Sammarco that night in the car?

25         A    No.
```

25

```
 1              G. Ramsay

 2    Q    No?

 3    A    No.

 4         MR. MARGOLIS:  You are not

 5    suggesting there was any such testimony

 6    are you, Mr. Tacopina?

 7         MR. TACOPINA:  I am talking about
```

```
 8          that.   I am asking if he was made aware

 9          of the fact that any of these people

10          testified to that.  Yes, I am

11          suggesting that.

12          Q      What is your current salary,

13   Mr. Ramsay?

14          A      About $150,000 a year.

15          Q      When you started in '92 what was

16   your salary?

17          A      About 38, 40.

18          Q      Your $150,000 salary that you are

19   currently earning, when did you achieve that

20   pay scale?

21          A      The last contract which was two

22   years ago.

23          Q      I may have asked you this, I will

24   ask it again if I can.  Prior to that night in

25   the car after the Cafe Iguana party had you
```

☐

26

```
 1                   G. Ramsay

 2   discussed Adele Sammarco?

 3          A      No.

 4          Q      After that night did you discuss

 5   Adele Sammarco?

 6          A      No.

 7          Q      When did you first meet Adele
```

8    Sammarco?

9          A    In '92 when we came to New York

10   1.

11         Q    You both came together?

12         A    Yes, as a group.

13         Q    You both started at the same

14   time?

15         A    Yes.

16         Q    I think you testified earlier

17   your relationship with Adele was an employment

18   relationship not a social one?

19         A    Correct.

20         Q    Can you describe the work

21   environment in the New York 1 newsroom in '92?

22         A    In '92, well, it was a start up,

23   so it was very close.  We all spent a lot of

24   time in this one room.  It wasn't much bigger

25   than this conference room.

[]

27

1                    G. Ramsay

2          Q    How about in that time frame, say

3    1999, 2000, 2001, what was the work

4    environment at New York 1, if you can describe

5    it?

6               MR. MARGOLIS:  I will object to

7          the form of that question.

8               Do you understand the question?

2686

```
 9                    THE WITNESS:  I think I do.

10        Q      Try to answer it as best you can,

11   please.

12        A      It was work.

13        Q      Well, I mean, can you describe

14   the type of banter that went on in the

15   newsroom at that time?

16                MR. MARGOLIS:  Objection to the

17          form of the question.

18        Q      Were there jokes made of the

19   sexual nature in the New York 1 newsroom?

20        A      No.

21        Q      Never?

22        A      Not in the newsroom, no.

23        Q      Where?

24        A      Now if you describe -- there

25   weren't jokes made about sex in the newsroom.
```

☐

28

```
 1                    G. Ramsay

 2   It happened -- if people said things it was

 3   probably when there were a group of reporters

 4   in the field.

 5        Q      Had you witnessed any of those

 6   sort of jokes or that type of banter of a

 7   sexual nature type of banter?

 8        A      Sporadic.  Throughout 14 years
```

```
 9    sporadically.

10        Q      I am going to show you what was

11    previously marked as Plaintiff's Exhibit 16.

12               MR. MARGOLIS:   I asked for a copy

13        of it, but I didn't get one.

14               MR. LAUFER:   You want a copy of

15        the whole tape?   You did get a copy of

16        the cover with the sticker, right?

17               MR. MARGOLIS:   Yes, I would like

18        a copy of the entire tape.

19        Q      Have you ever seen Plaintiff's

20    Exhibit 16 before?

21        A      No.

22        Q      Have you ever seen this videotape

23    that is entitled Fever Pitch in Adele

24    Sammarco's mailbox?

25        A      No.
```

□

29

```
 1                   G. Ramsay

 2        Q      Were you aware this was placed in

 3    her mailbox?

 4        A      No.

 5        Q      Have you ever said to anyone in

 6    the newsroom at New York 1 that Peter Landis

 7    was a racist?

 8        A      No.

 9        Q      Have you ever expressed that to
```

10   anyone?

11        A     No.

12        Q     About Peter Landis?

13        A     No.

14        Q     Do you believe Peter Landis to be

15   a racist?

16        A     No.

17        Q     Do you have a working

18   relationship with him?

19        A     Yes.

20        Q     A good relationship?

21        A     Yes.

22        Q     Have you ever had any problems

23   with him?

24        A     Yes, I have.

25        Q     Nothing to do with you believing

[]

30

1                    G. Ramsay

2    him to be either a racist or bias in any way

3    against you?

4         A     No, no, not racist, no.

5         Q     Are you aware it has been

6    referred to as a gag videotape, a Christmas

7    blooper reel that was passed out at New York

8    1?

9         A     There have been a few.

10       Q     Are you aware of one that was

11   made by Jeff Simmons regarding a gag videotape

12   of Adele Sammarco and a technician zippering

13   up her pants?

14       A     No.

15       Q     Had you ever seen this tape?

16       A     No.

17       Q     Have you heard of that tape?

18       A     No.

19       Q     The few that you referred to what

20   do they contain in general?

21       A     Live shot bloopers, anchor

22   bloopers, that kind of stuff.

23       Q     Nothing of a sexual nature?

24       A     No.

25       Q     You never seen any blooper

☐

31

1                  G. Ramsay

2    videotape that contained any acts of a sexual

3    nature?

4        A     I have never seen it.

5        Q     I will show you what has been

6    marked Plaintiff's 14.  Have you ever seen

7    this photo before?

8        A     No.

9        Q     You have never seen the photo of

10   Adele Sammarco whose head is superimposed on

11    someone's body with enlarged breasts with the

12    title "The green team is a bust."  You have

13    never seen that photograph before?

14         A     I have never seen this photo.

15         Q     So if I were to tell you it was

16    plastered all over company facilities that

17    would come as a surprise to you; is that

18    correct?

19         A     Absolutely.

20         Q     Do you know that Peter Landis

21    acknowledged this photo existed and it was on

22    the New York 1 premises and in the newsroom at

23    various times?

24              MR. MARGOLIS:  I will object.  He

25         already testified he didn't.

☐

32

1                    G. Ramsay

2         Q     Were you made aware that Peter

3    Landis already acknowledged that this existed?

4         A     No, no.

5              MR. MARGOLIS:  We will stipulate

6         it exists, Mr. Tacopina.

7              MR. TACOPINA:  Thanks.

8         Q     What is your relationship with

9    Jeff Simmons?

10         A     Jeff Simmons, I would say -- I

11      would describe Jeff Simmons as a friend.

12          Q      He still works with New York 1?

13          A      No, he does not.

14          Q      Did he leave New York 1?

15          A      Yes.

16          Q      Was he fired?

17          A      No.

18          Q      Do you know where he is at now?

19          A      He is doing some political

20      consulting work, PR work.

21          Q      By the way, where do you live,

22      Mr. Ramsay?

23          A      I am on the west side of

24      Manhattan.

25          Q      Would you provide your address

                                                                    33

1                        G. Ramsay

2       specifically?

3                        MR. MARGOLIS:  I will object to

4               that point.  He has given his business

5               address.  He is working for New York 1.

6               The witness would prefer not to supply

7               his home address.

8           Q      Is that true?

9           A      That is true.

10          Q      Would you agree with the

11      conclusion that in that car ride in 2000 after

12      the Cafe Iguana party that you made a pass at

13      Adele Sammarco?

14           A      Absolutely not.

15           Q      You wouldn't agree with that?

16           A      Absolutely not.

17           Q      Have you expressed interest in

18      the past prior to this incident in Adele

19      Sammarco in a sexual way to any of your

20      coworkers?

21           A      I may have.

22           Q      Who would that person have been?

23           A      I have no idea.  I can't.

24           Q      You say may have.  What exactly

25      does that mean?

☐

                                                     34

1                      G. Ramsay

2            A      I may have described Adele as an

3       attractive woman.

4            Q      That you had sexual desires?

5            A      No, not along those lines.

6            Q      Had you personally witnessed,

7       Mr. Ramsay, any inappropriate sexual contact?

8       I don't mean sex act, but inappropriate sexual

9       contact committed by any other New York 1

10      employees?

11           A      Not that I can recall.

```
12        Q        Not that you can recall?

13        A        No.

14        Q        How about any inappropriate

15   sexual comments?  I am not talking about the

16   few jokes you described sporadically in the

17   news vans.  Any inappropriate sexual comments

18   made?

19        A        Do you have an example?

20        Q        Yes.  For instance, Steven Paulus

21   speaking to a New York 1 reporter's boyfriend

22   about his quote unquote schlong in the

23   newsroom, do you recall anything like that?

24        A        No, no.

25        Q        How about Steven Paulus kissing a
```

35

```
1                  G. Ramsay

2    New York 1 female assistant; did you observe

3    that?

4         A        I have never seen that.

5         Q        How about Peter Landis brushing

6    against a female employee in the newsroom so

7    he could fondle her buttocks, have you ever

8    seen that?

9         A        No, no.

10        Q        Did you ever hear a New York 1

11   reporter ever ask Adele Sammarco how many cops

12   she slept with to get her stories?
```

13        A        I never heard that.

14        Q        Did you see Playboy magazines at

15    the assignment desk at New York 1?

16        A        No.

17        Q        You never seen those?

18        A        I never seen those.

19        Q        So it is your testimony that you

20    never seen any inappropriate sexual contact at

21    New York 1?

22        A        No.   Have I ever seen contact

23    with people at New York 1, I have.

24        Q        What do you mean by that?

25        A        People who are now husband and

36

1                        G. Ramsay

2    wife.

3        Q        Who?

4        A        Michael O'Loony and Annika

5    Pergament.

6        Q        When you say you have seen

7    contact, what does that mean?

8        A        Holding hands, touching.

9        Q        Are those the only two people you

10    observed such contact with?

11        A        That comes to mind, yes.

12        Q        Have you ever observed or heard

13        any inappropriate sexual comments made at New

14        York 1?

15              A      I have never heard them, no.

16              Q      Have you heard of them?

17              A      I have heard of them.

18              Q      What have you heard of?

19              A      It is someone heard that someone

20        else said that people were -- might have been

21        sleeping together, something like that.  I

22        don't know if it is inappropriate, but I am

23        probably putting it all in one category.

24              Q      Was there a mandate or was it a

25        policy that New York 1 employees should not be

Π

37

1                      G. Ramsay

2         sleeping with one another?

3               A      No, it wasn't a mandate.

4               Q      Was it against policy?

5               A      Only for managers and

6         subordinates.

7               Q      Did you ever have a sexual

8         relationship with any of your subordinates?

9               A      No.

10              Q      Did you ever have a relationship

11        with any female intern?

12              A      Yes.

13              Q      Who is that?

```
14              MR. MARGOLIS:  I will object to

15         any questions about -- I will put it

16         this way.  I will object to any

17         questions other than nonconsensual

18         relationships.  Questions about

19         concensual relationships are not part

20         of the subject of this deposition.

21         Q    Well, I am going to ask you to

22    answer that Mr. Ramsay, because you just

23    testified it was policy that a New York 1

24    employee should not have a sexual relationship

25    with a subordinate.  You just testified that
```

[]

38

```
1              G. Ramsay

2    you had one with an intern.  I am asking who

3    the intern is.

4              MR. MARGOLIS:  I will object to

5         that.  It is the subject of prior

6         motion practice, including a ruling

7         that concensual relationships are not

8         the proper subject of this lawsuit.

9              MR. TACOPINA:  The witness just

10        testified it is against company policy

11        and he just acknowledged these --

12        A    She was an intern.

13             MR. TACOPINA:  Your objection is
```

```
14       noted.

15           Q      Go ahead.  I am sorry.

16           A      At the time she had a job

17   someplace else.

18           Q      Who was that?

19           A      I can't recall her name.

20           Q      You can't recall the name of the

21   intern you had a sexual relationship with?

22           A      That's correct.

23           Q      How long did you have this sexual

24   relationship?

25           A      It was years ago.
```

□

39

```
1                    G. Ramsay

2           Q      How many years ago?

3           A      I would say seven or eight.

4           Q      You don't recall her first name?

5           A      Kristen.

6           Q      Kristen?

7           A      Yes.

8           Q      When did she work at New York 1?

9           A      Mid to late '90s, I think.  I

10   think.

11          Q      When did you have the

12   relationship with her, sexual relationship

13   with her?

14          A      After her internship had expired
```

15      she had -- she was still here waiting for her

16      job in Ohio.

17          Q       So her internship had expired and

18      she was still on New York 1 premises working?

19          A       No.

20          Q       So your sexual relationship with

21      Kristen didn't commence until after she left

22      New York 1?

23          A       That's correct.

24          Q       She got a job in Ohio?

25          A       Yes.

 

40

1                     G. Ramsay

2           Q       Where in Ohio?

3           A       A reporting job, I think, in

4       Cincinnati.

5           Q       You don't recall Kristen's last

6       name?

7           A       No.

8           Q       By the way, did Kristen ever make

9       any complaints to anyone at New York 1 about

10      you that you are aware of?

11          A       No.

12          Q       No?

13          A       No.

14          Q       How old was Kristen at the time?

15          A     I believe she was 20 years of
2099

16  age.

17          Q     20?

18          A     Yes.

19          Q     Could you describe her physical

20  attributes?

21                MR. MARGOLIS:   I will object at

22          this point.   There has been no

23          testimony and no evidence of any

24          nonconcensual relationship.   Given the

25          court has previously ruled on this I

[]

41

1                    G. Ramsay

2          will request that you limit your

3          questions to any nonconcensual physical

4          relationships.

5                MR. TACOPINA:   Again your

6          objection is noted.   We have been down

7          this road already.   I am now confronted

8          with a witness who doesn't know the

9          last name of this individual.   I have

10         a right to try to find out who she is.

11         I have a right to do an investigation.

12         Q     If you don't know her last name,

13  Mr. Ramsay, I will ask you to describe her.

14                MR. MARGOLIS:   I will object.   I

15         think you have to ask the witness

16          whether there was a nonconcensual

17          relationship or there was an allegation

18          of a nonconcensual relationship.  If

19          no, sir, it is not proper.  I think we

20          should call the magistrate.

21                    MR. TACOPINA:  You want to call

22          the magistrate, fine.

23                    (A short recess was taken.)

24                    MR. TACOPINA:  I will withdraw

25          the last question.

[]

42

1                    G. Ramsay

2          Q     Mr. Ramsay, to expedite this a

3     little bit I will ask you a few follow-ups on

4     the questions you already answered.

5                    It is your testimony under oath,

6     Mr. Ramsay, that you know the first name of

7     this intern you had sexual relations with,

8     that you know she left the station and went to

9     Cincinnati, Ohio and it is your testimony

10    under oath you do not know her last name?

11         A     Absolutely.

12         Q     Absolutely not?

13         A     Absolutely not.

14         Q     Was she originally from Ohio,

15    Kristen?

```
16        A        She has been a lot of places.

17    London.  She was a military brat.

18        Q        What?

19        A        Military kid.

20        Q        How long did you have this

21    relationship with her?

22              MR. MARGOLIS:   I have the same --

23        I have to assert the same objection.

24        We have been down this road with the

25        court.
```

43

```
1                    G. Ramsay

2              MR. TACOPINA:   There will be a

3        motion, Mr. Margolis, that will address

4        this new.   The reason which is I think

5        you are citing a ruling that was based

6        upon lack of specificity, but the

7        bottom line is we have a good faith

8        basis to go forward, especially in

9        light of these answers.

10              What I intend on doing is making

11        a motion to the court based upon these

12        answers.   We may need to revisit it

13        obviously after our investigation is

14        complete and ask additional questions

15        and testimony of Mr. Ramsay, but we

16        will deal with that in the legal
```

17          proceedings.

18                 MR. MARGOLIS:  Okay.

19          Q    I will move on.

20                 What is your definition of

21     inappropriate sexual behavior at the

22     workplace, Mr. Ramsay?

23          A    Making any comments about a

24     womens' appearance or -- not appearance, but

25     about her in a sexual way in terms of she

44

1                   G. Ramsay

2     has -- about her sexual -- I mean to me it is

3     anything that could be regarded as degrading

4     or humiliating to a female employee.

5          Q    You would agree that although you

6     testified you never seen Plaintiff's 14, the

7     bust pictures with Adele's head superimposed,

8     you would agree this would be sexually

9     inappropriate at the workplace?

10         A    Absolutely.

11         Q    Now I asked you before about a

12     little black book.  You said you had no such

13     little black book listing female interns and

14     so on and so forth.  Let my make sure that the

15     we are not having a difference of say a little

16     black book and you had a red book or

17    something, you had no list of female interns;

18    is that correct?

19         A    No.

20         Q    With their contact information?

21         A    No, no.

22         Q    Did you ever make an

23    inappropriate sexual was the Lalona Decena,

24    known as Lonnie?

25         A    I don't even know who it is.

45

1                    G. Ramsay

2         Q    You don't know who Lonnie Decena,

3    D-E-C-E-N-A?

4         A    No.

5         Q    Intern at New York 1?

6         A    No.

7         Q    Were you ever interviewed by EEOC

8    in regards to the claims brought by

9    Ms. Sammarco?

10         A    Yes.

11         Q    You are aware EEOC separate and

12    apart from New York 1 did their own

13    investigation?

14         A    Yes.

15         Q    Are you aware they gave

16    Ms. Sammarco the right to sue?

17                    MR. MARGOLIS:  I will object.  He

18          is not a lawyer.

19                  MR. TACOPINA:  I know.  I am

20          asking if he is aware.

21          Q     Are you aware?

22          A     No.

23          Q     Were you ever aware of Adele

24     Sammarco being referred to as BBB, a nickname

25     BBB by other employees at New York 1?

□

46

1                   G. Ramsay

2          A     BBB, no.

3          Q     Are you aware of any nicknames or

4     terms used to describe Adele by male employees

5     of New York 1?

6          A     No, not specifically to Adele,

7     no.

8                  MR. TACOPINA:  We have nothing

9          further right now.

10                 MR. MARGOLIS:  Thank you.

11                 (Time noted:  11:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

47

```
 1

 2               A C K N O W L E D G M E N T

 3

 4    STATE OF NEW YORK )
                       ) ss.
 5    COUNTY OF        )

 6

 7               I,  GARY ANTHONY RAMSAY, hereby

 8    certify that I have read the transcript of my

 9    testimony taken under oath in my deposition of

10    October 27, 2006; that the transcript is a

11    true, complete and correct record of what was

12    asked, answered and said during this

13    deposition, and that the answers on the record

14    as given by me are true and correct.

15

16

17               _____
                      GARY ANTHONY RAMSAY
18
```

```
19   Signed and subscribed to

20   before me, this _____ day

21   of _____, 2006.

22

23   _____
     Notary Public State of New York
24

25
```

☐

48

```
 1

 2                    INDEX

 3

 4   EXAMINATION BY              PAGE

 5     MR. TACOPINA                4

 6

 7

 8                 REQUESTS

 9   PAGE - LINE

10      28 - 17   Copy of tape

11

12             .

13

14

15

16

17

18
```

19

20

21

22

23

24

25

□

55

1

2                 C E R T I F I C A T E

3

4           I, SONYA OWEN, hereby certify that

5    the Examination Before Trial of GARY ANTHONY

6    RAMSAY was held before me on October 27, 2006:

7           That said witness was duly sworn

8    before the commencement of his testimony;

9           That the within testimony was

10   stenographically recorded by myself, and is a

11   true and accurate record of the Examination

12   Before Trial of said witness;

13          That the parties herein were

14   represented by counsel as stated herein;

15          That I am not connected by blood or

16   marriage with any of the parties.  I am not

17   interested directly or indirectly in the

18   matter in controversy, nor am I in the employ

19   of any of the counsel.

```
20            IN WITNESS WHEREOF, I have hereunto

21   set my hand this 30th day of October, 2006.

22

23

24            _____
                     SONYA OWEN
25
```

☐