UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

ADELE SAMMARCO,

                                    **Plaintiff,**

                    **- against -**                          02 Civ. 6239 (RRM) (JMA)

**NEW YORK 1, PETER LANDIS, STEVE
PAULUS, ELIZABETH FANFANT,**

                                    **Defendants.**
_____

## DEFENDANTS' *IN LIMINE* MOTIONS

## TABLE OF CONTENTS

**Table of Authorities** ............................................................................................ ii-vii
I.    **Legal Standards Applicable to All Motions** ........................................... 4
II.   **Precluded Witnesses** ......................................................................................... 5
  A.   *Testimony by Amy Boon* ............................................................................. 5
  B.   *Testimony by Enez Paganuzzi* ................................................................... 5
  C.   *Testimony by Jimmy Breslin* ...................................................................... 7
  D.   *Testimony by Dennis Sheehan and John Miller* ...................................... 8
  E.   *Testimony by Eric Adams, Patrick Lynch and Randy Credico* ............... 8
III.  **Barish Testimony and Treatment Notes** ....................................................... 10
  A.   *Barish Cannot Offer "Expert" Testimony Because Plaintiff Did Not Designate
    Her as an Expert Under Federal Rule of Civil Procedure 26(a)(2)(A)* ....................... 10
  B.   *Plaintiff Cannot Offer Barish's Lay Testimony and Treatment Records Because
    They Constitute Hearsay* ................................................................................. 13
  C.   *Barish's Lay Testimony and Treatment Records Should be Excluded Because
    They have Virtually No Probative Value and are Highly Prejudicial* ........................ 17
IV.   **Other Precluded Testimony** ........................................................................... 20
  A.   *Alleged "That's Sexual Harassment" Comment* ..................................... 20
  B.   *Alleged Comment About NY1 Intern Who "Fled" the Station* .............. 22
  C.   *Ramsay Arrest* ............................................................................................. 24
  D.   *Circumstances of Ramsay's Separation from NY1* ................................ 26
  E.   *Circumstances of Carter's Conviction and Separation from Employment* ........ 28
  F.   *Testimony by Plaintiff that Jeff Simmons Told Her that Paulus Stated that the
    Altered Photograph of Plaintiff Was Not "Pushing the Envelope"* ............................ 29
  G.   *Testimony by Melissa Russo that She Knew Paulus "Would Get into Trouble One
    Day"* ...................................................................................................................... 30
  H.   *Testimony Concerning Consensual Conduct* ........................................ 30
  I.   *Testimony by Plaintiff Concerning Alleged Harassment that She Did Not
    Witness* ................................................................................................................. 35
  J.   *Testimony that Sammarco Was Blackballed in the Industry* ............................... 37
  K.   *Testimony by Emery Concerning Plaintiff's Equal Pay Claim* ........................... 41
  L.   *Testimony by Plaintiff Concerning Incidents Involving Landis at His Prior
    Employer* ............................................................................................................. 43
  M.   *Testimony and Other Evidence Concerning Sammarco's Alleged Lost Wages
    Following her Resignation from Her Subsequent Employment* ............................... 44
V.    **Proposed Exhibits To Be Excluded** .............................................................. 45
  A.   *The "Fever Pitch" Videtape and Related Testimony* ............................. 45
  B.   *The Decision of the Administrative Law Judge of the New York Unemployment
    Board and Any Testimony By Plaintiff Concerning That Decision* ........................... 47
  C.   *Community Awards and Other Irrelevant Compliments* ..................................... 51
  D.   *The "Sample Reel" of Plaintiff's On-Air Appearances* ........................................ 55
  E.   *Misleading Instant Message Exhibit* ....................................................... 56
**CONCLUSION** .......................................................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abramowitz v. Inta-Boro Acres Inc.,*
   No. 98-CV-4139 (ILG), 1999 WL 1288942 (E.D.N.Y. Nov. 16, 1999) ................. 49, 50

*Arlo v. Lively,*
   474 F.3d 46 (2d Cir. 2007) .................................................................................... 4, 6

*Arroyo v. WestLB Admin., Inc.,*
   54 F. Supp.2d 224 (S.D.N.Y. 1999), *aff'd,* 213 F.3d 625 (2d Cir. 2000) ................... 48

*Barlow v. Connecticut,*
   319 F. Supp.2d 250 (D. Conn. 2004) *aff'd,* 148 Fed. Appx. 31 (2d Cir. 2005)........... 57

*Barnes v. Anderson,*
   202 F.3d 150 (2d Cir. 1999) .................................................................................. 12

*Bartniak v. Cushman & Wakefield, Inc.,*
   223 F. Supp.2d 524 (S.D.N.Y. 2002) ...................................................................... 47

*Berkovich v. Hicks,*
   922 F.2d 1018 (2d Cir. 1991) ................................................................................. 25

*Callahan v. Consol. Edison Co. of N.Y.,*
   No. 00-cv-6542, 2005 WL 578889 (S.D.N.Y. Jan. 4, 2005) ...................................... 47

*Coates v. A C and S, Inc.,*
   No. 90-1448, 1994 WL 34048 (E.D. La. Jan. 26, 1994) ............................................ 57

*Cruz v. Oxford Health Plans, Inc.,*
   No. 03 Civ. 8863, 2004 WL 2609528 (S.D.N.Y. Nov. 17, 2004) ............................... 32

*Dailey v. Societe Generale,*
   108 F.3d 451 (2d Cir. 1997) .................................................................................. 44

*Dale v. Chicago Tribune Co.,*
   797 F.2d 458 (7th Cir. 1986), *cert. denied,* 479 U.S. 1066 (1987) .............................. 53

*Daniels v. Loizzo,*
   986 F. Supp. 245 (S.D.N.Y. 1997) .......................................................................... 29

*Davidson v. Time Inc.,*
   972 F. Supp. 148 (E.D.N.Y. 1997).......................................................................... 55

*De Los Santos v. City of New York,*
   482 F. Supp.2d 346 (S.D.N.Y. 2007) ...................................................................... 33

*DeMarco v. West Hills Montessori,*
No. 09-0499-CV, 2009 WL 3463778 (2d Cir. Oct. 29, 2009)...............................36, 37

*Devlin v. Teachers' Ins. and Annuity Ass'n. of Am.,*
No. 02 Civ. 3228, 2003 WL 1738969 (S.D.N.Y. Apr. 2, 2003) ................................... 22

*Drummond v. IPC Int'l, Inc.,*
400 F. Supp.2d 521 (E.D.N.Y. 2005) .........................................................................33

*EEOC v. Delight Wholesale Co.,*
973 F.2d 664 (8th Cir. 1992) ....................................................................................45

*Evans v. Port Auth. of New York and New Jersey,*
192 F. Supp.2d 247 (S.D.N.Y. 2002)......................................................................... 21

*Folio Impressions, Inc. v. Byer California,*
937 F.2d 759 (2d Cir. 1991) ...................................................................................... 40

*Ford Motor Co. v. EEOC,*
458 U.S. 219 (1982) .................................................................................................. 44

*Franklin v. Greenwood Mills Mktg. Co.,*
33 Fair Emp. Prac. Cas. (BNA) 1847, 1983 WL 563 (S.D.N.Y. 1983)................9, 53, 54

*Hamilton v. Bally of Switzerland,*
No. 03 Civ. 5685, 2005 WL 1162450 (S.D.N.Y. May 17, 2005)................................. 39

*Hamilton v. Niagara Frontier Transp. Auth.,*
Nos. 00-CV-300SR, 00-CV-863SR, 2008 WL 4724324 (W.D.N.Y. Oct. 24,
2008) ......................................................................................................................... 50

*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.,*
No. 2:06-cv-2879, 2008 WL 2441067 (E.D. Cal. June 13, 2008).............................. 12

*Harris v. Forklift Sys., Inc.,*
510 U.S. 17 (1993)....................................................................................................33

*Hawkins v. 115 Legal Serv. Care,*
163 F.3d 684 (2d Cir. 1998) ......................................................................................45

*Hester v. BIC Corp.,*
225 F.3d 178 (2d Cir. 2000)...................................................................................... 42

*Howley v. Town of Stratford,*
217 F.3d 141 (2d Cir. 2000).......................................................................................37

*Johnson v. Elk Lake Sch. Dist.,*
283 F.3d 138 (3rd Cir. 2002) .....................................................................................27

*Kephart v. Inst. of Gas Tech.*,
   630 F.2d 1217 (7th Cir. 1980), *cert. denied*, 450 U.S. 959 (1981) ...............................53

*Laurin v. Pokoik*,
   No. 02 Civ. 1938LMM, 2005 WL 2230457 (S.D.N.Y. Sept. 13, 2005).......................31

*Leibovitz v. New York City Transit Auth.*,
   252 F.3d 179 (2d Cir. 2001)..................................................................................37

*Li v. Canarozzi*,
   142 F.3d 83 (2d Cir. 1998) ......................................................................................4

*Littman v. Firestone Tire & Rubber Co.*,
   709 F. Supp. 461 (S.D.N.Y. 1989) ........................................................................23

*Malarkey v. Texaco, Inc.*,
   983 F.2d 1204 (2d Cir. 1993) ................................................................................23

*McIntosh v. Irving Trust Co.*,
   873 F. Supp. 872 (S.D.N.Y. 1995) .........................................................................45

*McKnight v. Gen. Motors Corp.*,
   973 F.2d 1366 (7th Cir. 1992)..........................................................................44, 45

*Memnon v. Clifford Chance US, LLP*,
   667 F. Supp.2d 334 (S.D.N.Y. 2009) .....................................................................41

*Meritor Sav. Bank, FSB v. Vinson*,
   477 U.S. 57 (1986) ...............................................................................................32

*Michelson v. United States*,
   335 U.S. 469 (1948)..............................................................................................25

*Miller v. Beneficial Mgmt. Corp.*,
   776 F. Supp. 936 (D.N.J. 1991), *rev'd on other grounds*, 977 F.2d 834 (3rd Cir.
   1992)....................................................................................................................54

*Mischalski v. Ford Motor Co.*,
   935 F. Supp. 203 (E.D.N.Y. 1996).........................................................................27

*Musser v. Gentiva Health Servs.*,
   356 F.3d 751 (7th Cir. 2004) ................................................................................12

*Neely v. Miller Brewing Co.*,
   246 F. Supp.2d 866 (S.D. Ohio 2003) ...................................................................20

*Nyiri v. Aktiebolaget Electrolux*,
   No. 3:03CV1311BN (WHB), 2005 WL 6032846 (S.D. Miss. Jun. 16, 2005) ..............15

*Oncale v. Sundowner Offshore Servs., Inc.,*
   523 U.S. 75 (1998) ...................................................................34

*Paolitto v. John Brown E. & C., Inc.,*
   151 F.3d 60 (2d Cir. 1998) .................................................. 48, 49

*Parrish v. Sollecito,*
   No. 01 Civ. 5420 (VM), 2002 WL 1072227 (S.D.N.Y. May 28, 2002) .................33, 34

*Ricks v. Conde Nast Publ'ns,*
   6 Fed. Appx. 74 (2d Cir. 2001) ..............................................10

*Rock v. Huffco Gas & Oil Co., Inc.,*
   922 F.2d 272 (5th Cir. 1991)...................................................15

*Rooney v. Sprague Energy Corp.,*
   519 F. Supp.2d 110 (D. Me. 2007).............................................13

*Sammarco v. New York 1, et al.,*
   No. 02-CV-6239, Report .......................................................35

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,*
   183 F.3d 155 (2d Cir. 1999) ...................................................39

*Scaria v. Rubin,*
   117 F.3d 652 (2d Cir. 1997)...................................................55

*St. Mary's Honor Ctr. v. Hicks,*
   509 U.S. 502 (1993)..............................................................9

*Stephens v. Rheem Manufacturing Co.,*
   220 F.3d 882 (8th Cir. 2000) ..................................................34

*Sullivan v. Newburgh Enlarged Sch. Dist.,*
   281 F. Supp.2d 689 (S.D.N.Y. 2003) .........................................25

*Taylor v. Polygram Records,*
   No. 94 Civ. 7689(LSH), 1999 WL 124456 (S.D.N.Y. Mar. 8, 1999) ............................56

*Thomas v. iStar Fin., Inc.,*
   448 F. Supp.2d 532 (S.D.N.Y. 2006) ..................................... 39, 41

*Turner v. White,*
   443 F. Supp.2d 288 (E.D.N.Y. 2005)..................................... 13, 14

*U.S. v. Fortes,*
   619 F.2d 108 (1st Cir. 1980) ..................................................27

*U.S. v. Hayes,*
   553 F.2d 824 (2d. Cir. 1977)..................................................29

*U.S. v. Pickard,*
   211 F. Supp.2d 1287 (D. Kan. 2002) .......................................................27

*U.S. v. Sellers,*
   906 F.2d 597 (11th Cir. 1990)..................................................................27

*U.S. v. Simonelli,*
   237 F.3d 19 (1st Cir. 2001) ......................................................................27

*U.S. v. Tropeano,*
   252 F.3d 653 (2d Cir. 2001) ....................................................................56

*Woodard v. Monticello Cent. Sch. Dist.,*
   No. 06-CV-13361, 2008 WL 5062125 (S.D.N.Y. Dec. 1, 2008).................. 22

*Zubulake v. UBS Warburg LLC,*
   382 F. Supp.2d 536 (S.D.N.Y. 2005) .......................................................25

**STATUTES**

N.Y. Labor Law § 537(1)(b)................................................................................ 48

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(a)(2)(A) ................................................................ 10, 11, 12

Fed. R. Civ. P. 37(c)(1) ............................................................................... 11

Fed. R. Evid. 401................................................................................ passim

Fed. R. Evid. 402................................................................................ passim

Fed. R. Evid. 403................................................................................ passim

Fed. R. Evid. 404................................................................................ 24, 25, 26

Fed. R. Evid. 602................................................................................ 40, 44

Fed. R. Evid. 608 .................................................................................26, 27

Fed. R. Evid. 609................................................................................ 29

Fed. R. Evid. 611................................................................................ 27

Fed. R. Evid. 701 ................................................................................ 42

Fed. R. Evid. 702................................................................................ 12

Fed. R. Evid. 801 .............................................................................................. 5, 21, 23, 57

Fed. R. Evid. 802 ...................................................................................................... passim

Fed. R. Evid. 803 .............................................................................................. 13, 15, 16

Fed. R. Evid. 901(a) ...........................................................................................................56

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**ADELE SAMMARCO,**

                    **Plaintiff,**

         **- against -**                                   02 Civ. 6239 (RRM) (JMA)

**NEW YORK 1, PETER LANDIS, STEVE**
**PAULUS, ELIZABETH FANFANT,**                   **DEFENDANTS' *IN LIMINE***
                                                 **MOTIONS**
                    **Defendants.**

---

Defendants New York 1 ("NY1" or the "Company"), Peter Landis, Steve

Paulus and Elisabeth Fanfant (collectively, "Defendants"), by their attorneys, Kauff

McGuire & Margolis LLP and Proskauer Rose LLP,  respectfully submit this

memorandum of law and the accompanying affirmation of Michele A. Coyne, Esq.

("Coyne Aff.") dated March 15, 2010 and declaration of Steve Paulus ("Paulus Decl.")

dated March 12, 2010, in support of their motions *in limine* to exclude certain witnesses,

testimony and proposed exhibits from admission at trial.

Plaintiff Adele Sammarco ("Sammarco"), a former videojournalist with

NY1, claims that she was subjected to a sexually hostile work environment and

retaliation and discriminatory pay disparity.  Defendants deny Sammarco's allegations

in all material respects and assert that NY1 declined to renew her contract and

terminated her employment solely for legitimate, non-discriminatory reasons relating to

her work performance.  Plaintiff has proffered witnesses and her own testimony that

should be excluded on the grounds of hearsay, relevance and/or unfair prejudice, and

offers several exhibits that are inadmissible on several grounds.

1.   **PRECLUDED WITNESSES:**

- Amy Boon because the proffered testimony is hearsay;

- Enez Paganuzzi because the proffered testimony is irrelevant;

- Jimmy Breslin because the proffered testimony is irrelevant and cumulative;

- Dennis Sheehan and John Miller because the proffered testimony is hearsay;

- Eric Adams, Patrick Lynch and Randy Credico because the proffered testimony is irrelevant and/or hearsay; and

- Social worker Lucille Barish (including introduction of her treatment notes) because the proffered testimony is hearsay, and to the extent it is admissible, it is more prejudicial than probative.

2.   **PRECLUDED TESTIMONY:**

- Testimony by Plaintiff to the effect that another NY1 employee remarked "That's sexual harassment" in reference to an alleged incident involving Plaintiff and her former co-worker, Gary Anthony Ramsay;[1]

- Testimony by Plaintiff concerning an alleged hearsay remark by another NY1 employee to the effect that an NY1 intern had "fled" the station because of Ramsay;

- Testimony by Plaintiff, or cross-examination of Ramsay, concerning Ramsay's unrelated arrests and other alleged conduct;

- Testimony by Plaintiff or other witnesses, including Ramsay, concerning Ramsay's separation from employment with NY1;

- Testimony by any witness, or cross-examination of Dominic Carter, concerning the circumstances of Carter's criminal conviction and departure from NY1;

---

[1] In August 2000, Plaintiff informed Fanfant, NY1's Director of Human Resources, that when Ramsay drove her home from a non-work related social event a week earlier, he had attempted to kiss her. She now describes the incident as a "sexual assault," claiming that Ramsay pinned her down in the car and stuck his tongue down her throat, and that she was retaliated against for complaining about this incident to Fanfant.

- Testimony by Plaintiff to the effect that Jeff Simmons told her that Paulus stated that an altered photograph of Plaintiff was not "pushing the envelope;"[2]

- Testimony by Melissa Russo to the effect that she knew Paulus "would get into trouble one day;"

- Testimony by Plaintiff or other witnesses concerning consensual relationships at NY1;

- Testimony by Plaintiff concerning alleged incidents that Plaintiff did not witness;

- Testimony by Plaintiff and other witnesses to the effect that Plaintiff was "blackballed" in the industry following her termination from employment with NY1;

- Testimony by Richard Emery concerning Plaintiff's equal pay claim;

- Testimony by Plaintiff concerning rumors she heard about incidents involving Peter Landis at his prior employer; and

- Testimony or other evidence concerning Plaintiff's alleged lost wages following her resignation from her subsequent employment.

3.    **PRECLUDED PROPOSED EXHIBITS:**

- The "Fever Pitch" videotape and related testimony;

- The New York State Unemployment Insurance Appeal Board determination concerning Plaintiff's claim for unemployment;

- Awards and other compliments that Plaintiff received from third parties;

- The "Sample Reel" of Plaintiff's on-air performances; and

- An incomplete grouping of instant messages messages.

---

[2] Simmons, a non-managerial co-worker of Plaintiff, created a cartoonish photo of Plaintiff with enlarged breasts, bearing the caption "The Green Team is a Bust"; he did so as a practical joke, in connection with a team competition at a company picnic and was disciplined by NY1 for his conduct.

## I.     Legal Standards Applicable to All Motions

Federal Rule of Evidence 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Simply put, "[e]vidence that is not relevant is not admissible." *Arlo v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007) (citing Fed. R. Evid. 402). "If an item of evidence tends to prove a fact that is of consequence to the determination of the action, it is relevant. If it does not tend to prove a material fact, it is irrelevant." *Arlo*, 474 F.3d at 52 (quoting 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 401.04[2][a], at 401-19 (2d ed. 2006)). "A material fact is one that would affect the outcome of the suit under the governing law." *Arlo*, 474 F.3d at 52 (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 579 (2d Cir. 2006) (internal quotation marks omitted)).

Even if evidence is relevant, it should be excluded under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In applying Rule 403, "the trial judge has broad discretion to weigh the probative value of the evidence against the negative factors." *Li v. Canarozzi*, 142 F.3d 83, 88 (2d Cir. 1998). Evidence proffered from witnesses who lack personal knowledge and can only offer hearsay testimony should also be precluded.

## II.        Precluded Witnesses

*Testimony by Amy Boon*

According to Plaintiff's Witness List and Proffered Testimony ("Plaintiff's Proffer"), Boon, a former non-managerial NY1 employee, will testify to the following: "Spoke to Dan Forman, former News Director at ABC, withdrew job offer for Adele after speaking to Steve Paulus." Thus, Boon's proposed testimony is apparently intended to support Plaintiff's allegation, in paragraph 2 of her Amended Complaint, that she was "blackballed" by NY1 following the termination of her employment. This testimony is not admissible.

Plaintiff apparently desires to prove that Forman withdrew a job offer based on his conversation with Paulus, but seeks to do so through Boon's testimony as to what Forman *allegedly told her*. Boon's proposed testimony concerning the out-of-court statement of Forman, a third party, is the classic definition of hearsay: "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed R. Evid. 801. Furthermore, Boon's proposed testimony is not subject to any conceivable hearsay exception. Therefore, as the only testimony Plaintiff proposes to offer through Boon clearly is inadmissible, Boon should be precluded from testifying at trial.

*Testimony by Enez Paganuzzi*

Plaintiff's Proffer describes two topics for Paganuzzi's testimony: (1) "Assignment Editor who advised Adele to log sexual harassment complaints with HR Manager Eli[s]abeth Fanfant"; and (2) "said she told Jeff Simmons that the altered breast photo was quote, 'Not a good idea,' to circulate at company picnic." (Simmons, a non-managerial co-worker of Plaintiff, created a cartoonish photo of Plaintiff with

enlarged breasts, bearing the caption "The Green Team is a Bust"; he did so as a practical joke, in connection with a team competition at a company picnic and was disciplined by NY1 for his conduct. (Coyne Aff. Exhs. H, E [Simmons Tr. 25-27, 48; Fanfant Tr. 34, 38])).  Both proposed elements of Paganuzzi's testimony are irrelevant and she should therefore be precluded from testifying pursuant to Federal Rule of Evidence 402.

First, Paganuzzi's anticipated testimony to the effect that she told Sammarco to log her complaints with Fanfant does not tend to prove a fact that is of consequence to the determination of the action. *See Arlo*, 474 F.3d at 52.  Although the parties dispute the number and substance of Sammarco's complaints to Fanfant, there is no dispute that Sammarco spoke to Fanfant about various workplace matters on multiple occasions.  In addition, Fanfant testified that on two occasions, Sammarco spoke to her about what Sammarco considered to be inappropriate conduct of a sexual nature. (*See* Coyne Aff. Exh. E [Fanfant Tr. 28-29, 40-41]).  Both Sammarco and Fanfant will testify at trial about these conversations.  Whether Paganuzzi advised Sammarco to "log" the complaints she made is not at issue and therefore her testimony about that does not make any "fact of consequence" in the litigation more or less likely to be true; it is utterly irrelevant.

Second, proposed testimony by Paganuzzi to the effect that she told Jeff Simmons that it was "not a good idea" to circulate the altered photograph at the company picnic is also irrelevant.  Again, there is no dispute between the parties that Simmons created the photograph and that he showed the picture to people at the company picnic.  More importantly, there is simply no dispute that his actions in this regard were "not a good idea" and were viewed as such by NY1.  Specifically, Fanfant

reprimanded Simmons about the photograph and told him "the picture was offensive, the picture was unacceptable[,] . . . [i]t was against company policy [and] [i]t was unacceptable behavior." (Coyne Aff. Exh. E [Fanfant Tr. 34]).  In short, because it is undisputed that Simmons' conduct in creating and displaying the picture at the company picnic was considered to be inappropriate by NY1, Paganuzzi's testimony that she shared this view is irrelevant, and such testimony should be precluded under Federal Rule of Evidence 402.

### C. *Testimony by Jimmy Breslin*

In her Proffer, Plaintiff provides the following description of Breslin's anticipated testimony:  "Was at NY1 office and saw the Enhanced Breast Image of Adele and saw Adele crying because of it while driving him home."[3]  Breslin's proposed testimony is irrelevant and would involve the needless presentation of cumulative evidence.  For those reasons, Breslin should be precluded from testifying.  Fed. R. Evid. 402, 403.

Again, there is no dispute between the parties that Sammarco complained to Human Resources about the altered photograph and that NY1 regarded it as "offensive" and "unacceptable."  Therefore, Breslin's testimony to the effect that Sammarco showed him the photograph after the fact and that she was upset about the photograph would be irrelevant and cumulative and therefore should be excluded.

---

[3] While Plaintiff's Proffer is ambiguous on the point, Plaintiff's testimony makes clear that Breslin did not see the photo at NY1 but only after the fact, when Plaintiff showed it to him while driving him home.  (Coyne Aff. Exh. A [Pl. Tr. 1032]).

D. *Testimony by Dennis Sheehan and John Miller*

Plaintiff's Proffer makes clear that Dennis Sheehan and John Miller should be precluded from testifying because their testimony is, at a minimum, hearsay and in fact, may present multiple layers of hearsay. Fed. R. Evid. 802.

Plaintiff provides the following description of Sheehan and of his anticipated testimony:

> Television News Consultant who worked at CBS News in the 1970's with Steven Paulus's father; referred Reporters to Steve Paulus such as Jonathan Dienst for jobs; tried to help Adele get back into TV news by asking Carol Leff at SFX Media to make calls to News Managers, but was told "no one wanted to get involved in hiring Adele" after what happened to her at NY1; said Adele was "blackballed."[4]

As to Miller, according to Plaintiff's Proffer, Miller would testify that:

> Arranged an interview for Plaintiff at ABC with Dan Forman. Was told by Dan Forman that he would not hire her b/c of his conversation with Steve Paulus and from what he heard from Amy Boon.

There can be no question that the above described testimony is hearsay (or perhaps double hearsay). According to Plaintiff's Proffer, Sheehan and Miller would each testify to what they were told by non-parties about Plaintiff's job prospects. Miller and Sheehan should be precluded from offering this hearsay testimony.

E. *Testimony by Eric Adams, Patrick Lynch and Randy Credico*

In her Proffer, Plaintiff lists Adams, Lynch and Credico as "Rebuttal" witnesses and offers the following information for each:[5]

---

[4] To the extent that Sammarco would offer testimony by Sheehan concerning working with Paulus's father some 30 years ago or concerning his referral of other reporters to Paulus, such testimony should be precluded for the additional reason that it is clearly irrelevant. *See* Fed. R. Evid. 402.

[5] These witnesses are not proper "rebuttal" witnesses. Plaintiff apparently seeks to introduce the testimony of these witnesses to support her view that her performance was satisfactory.

- Adams is described as "NYS Senator" and "Founder of '100 Blacks in Law Enforcement'" and will testify that "Stated that Plaintiff *'did a lot of good for a lot of people.'*" (emphasis in original)

- Lynch is described as "President – PBA" and "Interviewed by Adele several times" and his testimony is described as "'Adele was an excellent reporter.'"

- As to Credico, Sammarco states, "Adele's reporting helped free a young woman held under the Rockefeller Drug Laws which led to Adele receiving a William Kunstler citation for Excellence in Journalism."

Adams, Lynch, and Credico were never employed by NY1 and have no personal knowledge regarding any of the conduct at issue in this action. Rather, based upon Plaintiff's Proffer, it seems that all three individuals were news sources with whom Plaintiff had contact. Presumably, Plaintiff intends to offer their testimony to contradict the anticipated testimony from a number of NY1 witnesses concerning the deficiencies in Plaintiff's performance that resulted in her termination. However, the views of members of the public, who are not journalists and were not involved in the decisions impacting Plaintiff's employment, are irrelevant to any issue to be tried. *See Franklin v. Greenwood Mills Mktg. Co.*, 33 Fair Emp. Prac. Cas. (BNA) 1847, 1854, 1983 WL 563, at *9 (S.D.N.Y. 1983) (granting employer's motion for judgment notwithstanding the verdict and finding that a third party's view of Plaintiff's performance did not support claim of discrimination). As such, they should be precluded from testifying. Fed. R. Evid. 402.

Even if this testimony were deemed to have some minimal relevance, moreover, it should be excluded under Fed. R. Evid. 403 because it presents a serious risk of "unfair prejudice, confusion of the issues, or misleading the jury." By reciting the

---

However, part of Plaintiff's *prima facie* case is to demonstrate that she was qualified for her position. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). As such, even if the testimony of these proposed witnesses were otherwise admissible – which it is not – they should not be permitted to testify in "rebuttal."

credentials of these proposed witnesses, Plaintiff makes clear her intent to attempt to mislead the jury by offering up favorable opinions of her work by these supposedly prominent citizens. Because, as discussed above, the views of these individuals were not a factor in any of NY1's decisions at issue in this lawsuit, their testimony could mislead the jury as to whether the reasons adduced by NY1 for her termination were a pretext for unlawful retaliation against her. *See Ricks v. Conde Nast Publ'ns*, 6 Fed. Appx. 74, 78 (2d Cir. 2001) (a plaintiff's performance must be judged according to the "employer's honestly-held expectations") (internal quotations omitted).

### III.      **Barish Testimony and Treatment Notes**

The testimony of Lucille Barish, who is described in Plaintiff's Proffer as "Treating healthcare provider for Plaintiff," should be excluded under Fed. R. Evid. 802 and 403. Any evidence offered by Plaintiff related to Barish's interactions with Plaintiff should be excluded on the following grounds: (1) any testimony that Barish could offer concerning statements made by Plaintiff during their sessions consists of inadmissible hearsay; (2) Barish cannot offer expert opinion because she was not designated as an expert; and (3) with respect to any lay opinion testimony that Barish could offer, the probative value of such evidence, if any, is substantially outweighed by the prejudicial effect of her testimony and its potential to confuse or mislead the jury.

### A. *Barish C annot Offer "Expert" Testimony Because Plaintiff Did Not Designate Her as an Expert Under Federal Rule of Civil Procedure 26(a)(2)(A)*

During the multiple years of discovery in this matter, Plaintiff never designated Barish, a social worker with whom Sammarco met for counseling between approximately May 1998 and January 2000, and again between May 2001 and January 2002, as an expert witness as required by Fed. R. Civ. P. 26(a)(2)(A). (Coyne Aff. Exh. B [Barish Tr. 64]). To the contrary, twice in response to Defendants' interrogatories,

Plaintiff identified Barish as a fact witness, not as an expert. (Coyne Aff. Exhs. I-J).
Plaintiff is thus not entitled to offer any testimony by Barish that is in the nature of
"expert" testimony. *See* Fed. R. Civ. P. 37(c)(1).

Of course, Plaintiff may not now attempt to designate Barish as an expert.
Magistrate Judge Azrack and Judge Gershon both rejected a prior attempt by Plaintiff to
designate another witness as an expert several years ago. Specifically, on November 20,
2006, during a conference before Magistrate Judge Azrack, Plaintiff made an
application to extend the time for expert discovery in order to permit her to designate an
economic expert to testify as to her alleged lost earnings. Magistrate Judge Azrack
denied Plaintiff's request because it was "outside of date by which discovery is to close."
(Coyne Aff. Exh. K). Likewise, on January 9, 2007, Plaintiff sent a letter to Judge
Gershon requesting that she "reverse the Chief Magistrate's order and allow the plaintiff
to notice one expert witness to the defendants, pursuant to FRCP 26(a)(2)(A)" "because
of the stressful nature of this matter, it has further exacerbated [Plaintiff's]
psychological condition. . . . Only an economist would be able to calculate these types of
damages." (Coyne Aff. Exh. L). Although Plaintiff had by then been treated by Barish
for years, Andrew Laufer, Plaintiff's attorney, made no mention of Barish providing
expert testimony as to Plaintiff's condition or damages. Instead, counsel referred to
noticing "one expert witness," an economic expert. Judge Gershon properly dismissed
Plaintiff's belated application as untimely. (Coyne Aff. Exh. K). More than three years
after that ruling, Sammarco cannot justify an attempt to now designate Barish as an
expert.

It is clear from Barish's deposition testimony and treatment notes that,
having failed to designate Barish as an expert, Plaintiff seeks to call Barish to elicit faux

11

and unqualified expert testimony. For example, Barish apparently would testify that Plaintiff suffered from post-traumatic stress syndrome ("PTSS"), allegedly caused by incidents at NY1. (Coyne Aff. Exh. B [Barish Tr. 113]). Such testimony is certainly in the nature of expert testimony. "[A] treating doctor (or other similarly situated witness) is providing expert testimony if the testimony consists of opinions based on 'scientific, technical, or other specialized knowledge' regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 n.2 (7th Cir. 2004). Testimony concerning the "medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of a lay person." *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999) (internal quotations omitted).

Unquestionably, Barish's diagnosis of PTSS during her treatment of Plaintiff purports to be based on "scientific, technical or other specialized knowledge," and if Barish could properly be qualified as an expert (which she cannot), it would fall squarely within the definition of expert testimony as set forth in Fed. R. Evid. 702. Indeed, Barish testified that she relied upon the PTSS criteria set forth in the DSM-IV (the standard medical treatise categorizing mental health disorders) and her years of experience as a social worker to diagnosis Plaintiff. (Coyne Aff. Exh. B [Barish Tr. 52, 119-20]). Plaintiff's failure to disclose Barish as an expert witness pursuant to Rule 26(a)(2)(A) and her repeated identification of Barish as a fact witness foreclose her from offering any "expert" testimony. *See Musser*, 356 F.3d at 757-58 (where plaintiffs failed to identify treating healthcare providers as expert witnesses, plaintiffs precluded from relying upon expert testimony in opposition to defendants' motion for summary judgment.); *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, No.

2:06-cv-2879, 2008 WL 2441067, at *5 (E.D. Cal. June 13, 2008) (granting defendants'
motion to exclude proposed expert testimony at trial because of plaintiff's failure to
disclose); *Rooney v. Sprague Energy Corp.*, 519 F. Supp.2d 110, 117 (D. Me. 2007)
(licensed social worker who was not designated as an expert witness and was not
permitted to testify "about her professional opinions – her diagnosis, her treatment
plan, [the plaintiff's] clinical response to the treatment plan, and other similar matters
of expert testimony.").

   B. *Plaintiff Cannot Offer Barish's Lay Testimony and Treatment Records
       Because They Constitute Hearsay*

       Even if Plaintiff seeks to offer Barish as a fact witness, such testimony
should be excluded because the statements that Plaintiff made to Barish, and Barish's
notes about their conversations, constitute hearsay and are not covered by any hearsay
exception.

       In particular, Federal Rule of Evidence 803(4) provides no basis for the
admission of Barish's testimony. That rule provides that certain otherwise inadmissible
statements made to medical providers can be admitted if the:

> [s]tatements [are] made for purposes of medical diagnosis or
> treatment and describing medical history, or past or present
> symptoms, pain, or sensations, or the inception or general
> character of the cause or external source thereof insofar as
> reasonably pertinent to diagnosis or treatment.

Significantly, in order for a statement made to a medial professional to be considered
one made for the purpose of medical diagnosis, the statement must be
"contemporaneous with" the incident for which the patient is seeking treatment. *See
Turner v. White*, 443 F. Supp.2d 288, 298 (E.D.N.Y. 2005) (excluding hearsay
statements to psychiatrist about incidents that occurred three years prior to the
treatment session). In addition, the medical professional must "rel[y] on the statement

13

in formulating his opinion and treatment plan" in order to admit the statement under the hearsay exception. *Id.* at 297.

Barish's treatment notes reveal that many of the statements Plaintiff made were not contemporaneous with the incidents for which Plaintiff was purportedly seeking treatment.[6] For example, Plaintiff made the following statements to Barish long after the events she purported to describe:

- "[Plaintiff] remembered that men at the station, after breakup [with her fiancé in 1998], would joke about her being asexual." (May 2, 2001 note).

- "Sometime in 2000, Jeff Simmons had come up to [Plaintiff] and asked her how many men she slept with to get good stories." (May 3, 2001 note).

- "Remembered that in 2000 – she thinks near the end of year – [Plaintiff] found a video tape in her mail box. Picture of a naked woman and called 'Fever Pitch.' Soccer cleats covering her breasts. About a strong woman who needed to get laid. Heard people laughing in hallway outside mail-room. Someone said 'You need to get laid.'" (May 10, 2001 note).

- "Bashe Warner, a Black man, had said to [Plaintiff] – sometime in 1999 or 2000 – why didn't she give a 'Black man a chance.'" (May 23, 2001 note).

- "A young female intern had, 'fled' the station [in 2000] . . . it was rumored that Gary Ramsey had attacked her." (June 27, 2001 note).[7]

(Coyne Aff. Exh. C).

As these notes reveal, Sammarco's discussions with Barish were rife with statements that were not contemporaneous with the occurrence of the alleged incidents; these statements are inadmissible hearsay because they were not made to Barish for the purpose of medical treatment. *See Turner*, 443 F. Supp.2d at 298.

---

[6] While Sammarco may have made some statements contemporaneous with the alleged events, such statements cannot satisfy additional admissibility requirements. *See* Section III.C., *infra*.

[7] Barish's treatment notes are over 200 pages. For purposes of this motion, Defendants provide a sample of the entries in Barish's treatment notes. Barish's handwriting is difficult to read, but

Moreover, there is simply no indication that Barish relied upon any of these untimely statements in forming her opinion about Plaintiff's diagnosis. In fact, Barish told Plaintiff in April 2001 that she was suffering from PTSS symptoms even before Plaintiff disclosed to her any of the above-noted events. Therefore, any alleged incidents that Plaintiff described to Barish after Barish's diagnosis are not admissible under Fed. R. Evid. 803(4) since Barish could not have relied upon them.

In addition, statements that Plaintiff made to Barish about the allegations in this lawsuit cannot be admitted under Fed. R. Evid. 803(4) because they lack the required circumstantial guarantees of trustworthiness. The hearsay exception for statements made to medical professionals is based on the principle that such comments are sufficiently trustworthy "in view of the [declarant's] strong motivation to be truthful." 1972 Advisory Committee Notes to Rule 803(4). However, where the declarant is motivated by the possibility of litigation, such self-serving statements "simply cannot provide the circumstantial guarantees of trustworthiness" required by the hearsay exceptions. *Rock v. Huffco Gas & Oil Co., Inc.*, 922 F.2d 272, 283 (5th Cir. 1991) (excluding statements made to insurance claims adjustor where the declarant "likely realized that the statement would be used in any forthcoming litigation"); *see also Nyiri v. Aktiebolaget Electrolux*, No. 3:03CV1311BN (WHB), 2005 WL 6032846, at *5 (S.D. Miss. Jun. 16, 2005) (excluding statements about injury made three months after declarant submitted a claim for his injuries).

Clearly, many of Plaintiff's statements to Barish were made in contemplation of litigation and are therefore inadmissible. Notably, it was only after

---

Defendants represent that the transcriptions included herein are Defendants' good faith reading of the notes.

Plaintiff filed her charge with the Equal Employment Opportunity Commission on April 5, 2001 that Plaintiff revealed to Barish a number of untimely allegations that she had never previously mentioned, such as:

- "Becky Spitz, the Manhattan reporter in 1999, got a big hug from Peter and he said to Adele 'I could never do this to you.' Becky also told Adele that Peter was a dirty old man and wanted to take a shower after he touched her." (May 1, 2001 note).

- "Roma Torre, a head anchor had told [Plaintiff] in 1999 sometime – didn't remember when – in the makeup room – that she had asked Peter if she could write. [Peter] knocked her down." (May 2, 2001 note).

- "Remembered that [unidentified female] had told [Plaintiff] in 1998 or 1999 that Steve had kissed [unidentified female] outside Il Porto, after a dinner. Would brag in newsroom that [unidentified female] went to a play with him and got no sleep." (May 3, 2001 note).

- "[Fanfant] had told [Plaintiff] . . . that a number of women had had problems with [Landis] -- mentioned Bernie Han and Inez Paganuzzi." (May 15, 2001 note).

(Coyne Aff. Exh. C).

There can be no question that Plaintiff realized the possibility that these statements would be part of the litigation she had initiated by way of her charge of discrimination with the EEOC. Indeed, contemporaneous with Sammarco's disclosure of these previously unmentioned allegations, Sammarco and Barish discussed Plaintiff's lawsuit and upcoming trial, and they did so repeatedly, on June 6 and 11, 2001, July 2, 18, and 26, 2001, October 3, 15, and 31, 2001, November 1, 15, 26 and 28, 2001, April 30, 2002 and November 26, 2002. (Coyne Aff. Exh. C). In light of Plaintiff's self-serving motivation for making these statements, they lack the requisite indicia of reliability and, therefore, should not be admitted under Fed. R. Evid. 803(4).

### C. *Barish's Lay Testimony and Treatment Records Should be Excluded Because They Have Virtually No Probative Value and are Highly Prejudicial*

Similarly, Barish's lay testimony and treatment records (if offered by Plaintiff) should be excluded because they consist largely of statements that have little or no probative value and are highly prejudicial. Fed. R. of Evid. 403.

Barish's testimony concerning what Plaintiff told her during their sessions would have no probative value, since Barish lacks personal knowledge of the events in question and will be entirely duplicative of the testimony Plaintiff herself will offer about those events. A sample of Barish's deposition testimony illustrates that Barish can only repeat what Sammarco told her:

> Q: Do you remember specifically what treatment by Mr. Landis constituted the tensions directed her way that you referred to?
>
> A: . . . She told me that there was a great deal of sexual goings on in the newsroom, a lot of touch-feely, back rubs, Landis and Paulus. Jeff Simmons doing zip mail, which she explained to me was instant messages to them telling them about the gossip in the newsroom and about sexual provocative jokes. . . . [Peter Landis] yelled at her in the newsroom in a way that he never yelled at anyone else. . . . in 1999 [Landis] pulled her off the anchor desk and said he was starting an internal investigation of her. . . . [Jeff Simmons] produced this picture, which is in the record, of her with enormous boobs, and he showed it at a picnic which was very humiliating to her. . . . [Landis] yelled at her because she wasn't bringing in enough receipts from bars . . . because it seemed to her there was an implication that, you know, she should be doing things that she felt were egregious in order to get sources and tips . . .

(Coyne Aff. Exh. B [Barish Tr. 66-68]). Plaintiff testified to these same types of allegations during her deposition. Barish's testimony, which can consist only of Barish parroting back Sammarco's allegations, has no probative value.

Moreover, Barish's deposition testimony is replete with inflammatory and unfairly prejudicial characterizations of events.  For example, Barish made the following inflammatory statements during her deposition:

> Q: Would you consider any of the information contained in paragraph 34 [of the Amended Complaint] to be significant of your treatment of [Plaintiff]?
>
> . . .
>
> A: I can only give you an opinion, and the opinion would be that this was certainly egregious behavior.
>
> * * * *
>
> Q: Did you want to make a statement, Ms. Barish?
>
> . . .
>
> A: Yes.  The statement I want to make is whether every one of these incidents appeared in the record or not, there was more than enough that I have written down in my notes to show that there was a repeated pattern of ill treatment of Ms. Sammarco that was egregious and totally unfair.

(Coyne Aff. Exh. B [Barish Tr. 97-99]).

Barish's treatment notes contain similarly provocative gratuitous comments:

- "I empathize again and tell her her stamina in the face of these assaults is nothing less than extraordinary."  (October 11, 1999 note).

- "I tell her she has been very abused by Steve and Peter."  (March 13, 2001 note).

- "[Plaintiff] needed support for all the trauma she had endured and continued to endure."  (April 2, 2001 note).

- "I hoped and felt she could win her lawsuit, and perhaps that would revive her career."  (June 6, 2001 note).

- "I do agree that [Plaintiff's] refusal to play the game as a woman – flirty, etc. had set her up for trouble."  (June 25, 2001 note).

(Coyne Aff. Exh. C).

Clearly, statements that characterize Plaintiff's treatment and experiences in such subjective and inflammatory terms, and which consist of nothing more than Barish's personal opinions regarding allegations Plaintiff presented to her, would prejudice Defendants unfairly in the eyes of the jurors. Whatever minimal probative value that Barish's testimony might have is substantially outweighed by the unfair prejudice to Defendants of her recapitulation of Sammarco's allegations, embellished with terms such as "abuse" or "egregious." Thus, the Court should exclude Barish's testimony pursuant to Fed. R. Evid. 403.

Additionally, Barish's deposition testimony is replete with legal conclusions that are well outside the scope of her role as a lay witness (and, for that matter, her professional experience as a social worker). For instance:

> Q: Do you know whether Ms. Sammarco has ever been the victim of a crime?
>
> . . . .
>
> A: Yes, she was the victim of a crime by Gary Ramsey . . . he sexually assaulted her.
>
> . . . .
>
> Q: Other than the unreported crime of Mr. Ramsey, do you know whether Ms. Sammarco has ever been the victim of a crime?
>
> A: Well, unless you consider her treatment at Channel 1 from the time that Mr. Landis came in, no. I consider his behavior criminal . . . that's my opinion now that it was criminal behavior.
>
> . . .
>
> Q: And that's the incident you referred to earlier as a sexual assault?
>
> A: It's a sexual assault, yes. It was unwanted, unasked for. It's a sexual assault.

(Coyne Aff. Exh. B [Barish Tr. 104-106, 123, 125]).

Similarly, in her treatment notes, Barish repeatedly describes the Ramsay incident as an "assault" or "sexual assault." (*See* August 30, 2000, January 29, 2001, May 3 and 7, 2001, June 4, 6, and 20, 2001, July 23, 2001, October 29, 2001, and December 29, 2001 notes) (Coyne Aff. Exh. C). Certainly, Barish, a lay witness, should not be permitted to testify to her own "legal" conclusions. *Neely v. Miller Brewing Co.*, 246 F. Supp.2d 866, 871 (S.D. Ohio 2003) (social worker precluded from testifying to her legal conclusions). To permit Barish to testify to these conclusions, or to admit her treatment notes that contain the same conclusions, would only serve to confuse and mislead the jury, to the extreme prejudice of Defendants. Accordingly, Barish's testimony and treatment notes, if offered by Plaintiff, should be excluded under Fed. R. Evid. 403.

## IV.     Other Precluded Testimony

*Alleged "That's Sexual Harassment" Comment*

Plaintiff should be precluded from testifying to the effect that Dan Jacobson, a NY1 employee, said "That's sexual harassment" when Sammarco told Jacobson about the Ramsay incident (*See* n. 1 *supra*). Sammarco testified as follows concerning her conversation with Jacobson about the incident:

> I said, Hey, Dan, you know, Gary attacked me. And Dan immediately tightened up. You could see his body just clenching, his fists were hitting the computer keys. He just tightened up as if he atrophied. And he said, That is sexual harassment.

(Coyne Aff. Exh. A [Pl. Tr. 302]). Jacobson's alleged statement is unquestionably inadmissible hearsay. Fed. R. Evid. 802.

Plaintiff cannot avoid the exclusion of Jacobson's supposed statement by arguing that his statement was a "statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the

relationship." Fed. R. Evid. 801(d)(2)(D). The alleged comment by Jacobson cannot be
deemed an admission by Defendant NY1 because Plaintiff cannot show that Jacobson
was acting within the scope of his employment as an agent of NY1 when he made the
statement.[8] *See, e.g.*, *Evans v. Port Auth. of New York and New Jersey*, 192 F. Supp.2d
247, 263-64 (S.D.N.Y. 2002), *clarified on reconsideration on other grounds by*, No. 00
Civ. 5752, 2002 WL 1941557 (S.D.N.Y. Aug. 22, 2002) ("statements regarding
employment matters are within the scope of the declarant's employment if the declarant
was 'an advisor or other significant participant in the decision-making process that is
the subject matter of the statement'" but "not everything that relates to one's job falls
within the scope of one's . . . employment.") (citations omitted).

Clearly, the alleged statement by Jacobson did not concern a matter within
the scope of Jacobson's employment.  According to Sammarco, Jacobson, as managing
editor at NY1, "gets in scripts, pulls scripts." (Coyne Aff. Exh. A [Pl. Tr. 78]). The
alleged incident involving Ramsay, even by Sammarco's own account, occurred away
from NY1's premises following a non-work social event; commenting on such an event
could not possibly fall within the scope of Jacobson's employment. (Coyne Aff. Exh. A
[Pl. Tr. 266-67]). As such, any testimony concerning this statement should be precluded
as hearsay. Fed. R. Evid. 802.

Moreover, even apart from its status as hearsay, the comment should be
excluded under Fed. R. Evid. 403. Jacobson obviously is not in a position to judge what
conduct does or does not constitute "sexual harassment." Thus, it would be unfairly
prejudicial to Defendants for Plaintiff to be permitted to present a declaration by a NY1

---

[8] In any event, there is no possible basis upon which to admit this statement against individual
Defendants Paulus, Landis and Fanfant.

employee on what is one of the ultimate issues to be determined in the action – whether the Ramsay incident, involving non-supervisory co-workers, unrelated to and off the premises of NY1, constituted "sexual harassment" under applicable law. *See, e.g., Devlin v. Teachers' Ins. and Annuity Ass'n. of Am.*, No. 02 Civ. 3228, 2003 WL 1738969, at *7 (S.D.N.Y. Apr. 2, 2003) ("[a]s a general rule, 'employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees,' because those actions are not part of the work environment.") (quoting *Feliciano v. Alpha Sector, Inc.*, No. 00 Civ. 9309, 2002 WL 1492139, at *8 (S.D.N.Y. June 12, 2002)).

### B. *Alleged Comment About NY1 Intern Who "Fled" the Station*

The Court should preclude any testimony concerning an alleged incident involving Gary Anthony Ramsay and a NY1 intern. At her deposition, Plaintiff claimed that when she informed David Kern, Creative Services Manager at NY1, of the alleged incident involving Ramsay and she, Kern allegedly said, "Gary did the same thing to an intern who fled the station." (Coyne Aff. Exh. A [Pl. Tr. 99]). Plaintiff went on to say that Kern "told me he couldn't reveal her name but the young girl left the station after Gary had done what he did to her." *Id.*

Sammarco's anticipated testimony concerning Kern's alleged comment should be precluded as inadmissible hearsay under Federal Rule of Evidence 802. In fact, Plaintiff's anticipated testimony is not just hearsay, but it is hearsay within hearsay (*i.e.*, the supposed intern's statement to Kern which Kern allegedly repeated to Plaintiff). Because neither statement fits into an exception to the hearsay rule, this testimony must be barred. *See Woodard v. Monticello Cent. Sch. Dist.*, No. 06-CV-13361, 2008 WL 5062125 at *10 (S.D.N.Y. Dec. 1, 2008) (in granting summary judgment for employer,

finding that "double hearsay" that a fellow teacher told plaintiff that another teacher had made a racial slur about her was inadmissible hearsay).

Moreover, Kern's supposed statements do not constitute an admission by a party under Federal Rule of Evidence 801(d)(2)(D). Kern was not part of NY1's Human Resources department, was not responsible for creating any employment policy, and was never Sammarco's supervisor. (Paulus Decl. at ¶ 3). As NY1's Creative Services Manager, Kern was responsible for producing and editing promotions, animations and other marketing materials. (Paulus Decl. at ¶ 2). As such, the comment Sammarco attributes to him, even if made, did not relate to any matter within Kern's scope of employment and therefore clearly falls outside the scope of Rule 801(d)(2)(D). *See Littman v. Firestone Tire & Rubber Co.*, 709 F. Supp. 461, 467 (S.D.N.Y. 1989) (excluding as hearsay comment allegedly made to plaintiff "[b]ecause [the declarant] is not in [Defendant's] personnel department or plaintiff's direct supervisor, his statement deals with a subject not within the scope of his employment").

Even if Sammarco were able to overcome the hearsay exclusion of Kern's statement to Sammarco (which she cannot), Sammarco's testimony on this point must still be excluded because the alleged statement by the unnamed intern to Kern is itself inadmissible hearsay, not covered by any hearsay exception.[9]

---

[9] The admission of this testimony would also run afoul of Fed.R.Evid. 404(b), which prohibits the introduction of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." The obvious and impermissible purpose for which Sammarco would offer this testimony is to create the impression that her account of the Ramsay incident conforms to his alleged prior conduct. *See Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1211 (2d Cir. 1993) (judge correctly excluded "background evidence" of earlier discriminatory acts where not probative of issue at bar and likely to be prejudicial).

C. *Ramsay Arrest*

The Court should bar any evidence relating to Ramsay's arrest record and a similar allegation to the effect that Ramsay had an altercation with a police officer.  At deposition, Plaintiff's counsel questioned Ramsay as to whether he had ever been arrested.  Ramsay admitted that he was arrested twice, once in 2000 for disorderly conduct and once in college for "failure to turn in a cable box essentially." (Coyne Aff. Exh. G [Ramsay Tr. 5-6]).  Plaintiff's counsel also inquired as to whether Ramsay had "an altercation with a police officer" "in 2000 during the Yankee Mets subway series game." *Id*. at 6.  Ramsay denied any altercation.  *Id*. at 6-7.  Ramsay's prior arrests and the allegation that he was a participant in an altercation have absolutely no relevance to this matter and are unfairly prejudicial to Defendants.  Therefore, under Federal Rules of Evidence 402, 403, and 404, Defendants seek an order barring any testimony – including testimony from Plaintiff and through cross-examination of Ramsay – concerning Ramsay's prior arrests or suggesting that he had an altercation with a police officer.

As an initial matter, these incidents (or supposed incidents) are wholly irrelevant because they have no connection to Sammarco's employment with NY1, and one arrest occurred some number of years ago when Ramsay was in college.  Although Plaintiff's counsel did not inquire as to the circumstances of the second arrest, it certainly had nothing to do with Sammarco since Sammarco has admitted that she never contacted the police concerning what she now claims was Ramsay's sexual assault of her.  (Coyne Aff. Exh. A [Pl. Tr. 282-83]).

In any event, any limited probative value there might be to testimony about Ramsay's arrests would be "substantially outweighed by the danger of unfair

24

prejudice" to Defendants.  Surely such information would be intended to impugn Ramsay's character in the eyes of the jury, in an improper attempt to lend credence to Plaintiff's theory that Ramsay assaulted her.  *See Sullivan v. Newburgh Enlarged Sch. Dist.*, 281 F. Supp.2d 689, 710 (S.D.N.Y. 2003) (granting defendants' motion *in limine* to exclude evidence of prior conviction under Fed. R. Evid. 402 and 403, finding that it had "no probative value in plaintiff's civil case, and is extremely prejudicial").  Ramsay's arrests or similar incidents – not even convictions – for minor offenses completely unrelated to Plaintiff's allegations can certainly serve no purpose other than to prejudice the jury against him and, thereby, against Defendants.  *See Zubulake v. UBS Warburg LLC*, 382 F. Supp.2d 536, 547 (S.D.N.Y. 2005) (excluding evidence of arrest finding "[t]he resulting prejudice from proof of this arrest would outweigh its probative value"); *see generally Michelson v. United States*, 335 U.S. 469, 482 (1948) ("arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness.  It happens to the innocent as well as the guilty").

In addition, Plaintiff undoubtedly would attempt to use such evidence to suggest that Ramsay had a propensity for violence. However, under Fed. R. Evid. 404(b), evidence of "other crimes, wrongs or acts" cannot be used "to prove the character of a person in order to show action in conformity therewith."  The exceptions listed in Rule 404(b) are quite narrow, and none applies here:  Ramsay's arrests for two relatively minor incidents are not "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" for any of the acts Plaintiff has alleged.  Fed. R. Evid. 404(b). *See Berkovich v. Hicks*, 922 F.2d 1018, 1022 (2d Cir. 1991) (excluding evidence of officer's prior civilian complaints as "no more than a veiled

attempt to do what Rule 404(b) expressly prohibits – introducing evidence of bad acts to show the defendant's propensity to commit such acts").

D. *Circumstances of Ramsay's Separation from NY1*

No testimony or other evidence regarding the circumstances surrounding the end of Ramsay's employment with NY1 in 2007 should be admitted.  Evidence of Ramsay's separation from employment with NY1, years after Sammarco's termination, has no conceivable relevance to this matter.

In November 2007, Ramsay telephoned into "The Call," a NY1 call-in show and spoke to the host, John Schiumo.  (Paulus Decl. at ¶ 4).  Ramsay identified himself as "Dalton from the Upper East Side" and commented on the topic of the show that evening.  (*Id.*).  Shortly after Ramsay placed this call, Ramsay separated from his employment at NY1.  (*Id.* at ¶ 5).

Ramsay's separation from employment occurred more than six years after Sammarco's termination from NY1 and, therefore, the circumstances of Ramsay's departure have no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable."  Fed. Rule of Evid. 401.  As such, any evidence regarding the end of Ramsay's employment with NY1 should be excluded.

Moreover, any attempt by Plaintiff to introduce evidence of the circumstances of Ramsay's departure from NY1 during his cross-examination should not be permitted under Federal Rule of Evidence 608(b).[10]  "The discretion of the district

---

[10] Federal Rule of Evidence 608 (b) provides, "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . may . . . in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or

court under Rule 608 is guided by several factors, including whether the instances of prior untruthfulness bore some similarity to the conduct at issue, whether or not they were remote in time, whether they were cumulative of other evidence, and whether there was some likelihood they happened." *U.S. v. Simonelli*, 237 F.3d 19, 23 (1st Cir. 2001). "The trial court is required under the rule to balance the probative value of specific instance evidence against the potential dangers and costs of the evidence as recognized in Rules 403 and 611." *Id.* at 23-24.

Here, the circumstances involved in this matter bear no resemblance whatsoever to Ramsay mis-identifying himself for personal reasons when expressing a viewpoint during the course of a television call-in show. *See Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 145-46 n.2 (3rd Cir. 2002) ("[T]he trial court was within its discretion to conclude that [witness'] lying on his resume, although duplicitous and wrong, was not so indicative of moral turpitude as to be particularly probative of his character for untruthfulness."); *U.S. v. Sellers*, 906 F.2d 597, 602 (11th Cir. 1990) (stating, with respect to incident in which witness lied to hospital staff, "[t]his isolated untruth, however, which was apparently motivated by extreme emotional distress, would seem to have little if any conceivable relevance to his credibility at trial"); *U.S. v. Fortes*, 619 F.2d 108, 118 (1st Cir. 1980) ("[T]he district court is not bound to allow examination into every incident, no matter how remote in time and circumstance, that may possibly bear upon the witnesses' veracity."); *U.S. v. Pickard*, 211 F. Supp.2d 1287, 1295 (D. Kan. 2002) ("[A]n isolated untruth may have little, if any, conceivable relevance to a witness' credibility at trial."); *Mischalski v. Ford Motor Co.*, 935 F. Supp.

---

untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

203, 207-08 (E.D.N.Y. 1996) (status of being illegal immigrant not probative of credibility). Similarly, Ramsay's use of a pseudonym on a single occasion when calling a television program would have no probative value concerning his credibility under oath, and any cross-examination concerning this topic should be precluded.

*Circumstances of Carter's Conviction and Separation from Employment*

Dominic Carter, a former NY1 employee, appears on both parties' witness lists. According to published media reports, Carter was recently convicted of, and incarcerated for, misdemeanor attempted assault against his wife. This incident, coming more than seven years following Sammarco's termination from employment, has no conceivable relevance to this case and evidence concerning these events could only serve to unfairly prejudice the jury against Carter, and thereby against Defendants. Testimony or other evidence concerning Carter's termination from employment and his conviction is inadmissible under Federal Rules of Evidence 402 and 403.

The circumstances of Carter's conviction and separation from employment have no relevance to this matter. These events occurred more than eight years after Sammarco's termination. More importantly, Sammarco has not made any allegation of mistreatment by Carter. To the contrary, Plaintiff described Carter as follows: "Dominic was always the perfect gentleman to me, a wonderful person." (Coyne Aff. Exh. A [Pl. Tr. 1022]). Therefore, evidence concerning Carter's conviction and separation from employment has no conceivable relevance and should be precluded. Fed. R. Evid. 402.[11]

---

[11] Moreover, introducing testimony or other evidence to the effect that Carter committed an act of domestic violence against his wife carries the risk of unfair prejudice to Defendants should Defendants call him as a witness. Such evidence should be barred under Federal Rule of Evidence 403.

Evidence concerning Carter's conviction, and resulting separation from employment, is not admissible for impeachment purposes under Federal Rule of Evidence 609 for at least two reasons.

First, the charge on which Carter was convicted (misdemeanor attempted assault) is not punishable "by imprisonment in excess of one year." Therefore, his conviction is not admissible to impeach Carter under Federal Rule of Evidence 609(a)(1).

Second, his conviction may not be used to impeach him under Federal Rule of Evidence 609(a)(2) because establishing the elements of the crime of misdemeanor attempted assault does not "require[] proof or admission of an act of dishonesty or false statement by the witness." Fed. R. Evid. 609(a)(2); *see also U.S. v. Hayes*, 553 F.2d 824, 827 (2d. Cir. 1977) (crimes of force such as assault are not covered by Fed. R. Evid. 609(a)(2)); *Daniels v. Loizzo*, 986 F. Supp. 245, 251 (S.D.N.Y. 1997) ("assault convictions do not involve dishonesty or false statements").

For these reasons, any testimony, including cross-examination of Carter concerning this incident, should be precluded.

F.   *Testimony by Plaintiff that Jeff Simmons Told Her that Paulus Stated that the Altered Photograph of Plaintiff Was Not "Pushing the Envelope"*

On more than one occasion during her deposition, Plaintiff testified to the effect that Jeff Simmons, the creator of the altered photograph, told her that Steve Paulus told Simmons that the photograph was "not pushing the envelope." Such testimony should be excluded at trial because it is rank hearsay.

Specifically, Sammarco testified as follows:

- "Jeff Simmons told me that – and this is his quote – and I'm quoting, "Well, Steve said it's not pushing the envelope." (Coyne Aff. Exh. A [Pl. Tr. 66])

- "Jeff Simmons himself told me afterwards that Steve Paulus okayed the breast shot of me. It wasn't, quote, pushing the envelope." (Coyne Aff. Exh. A [Pl. Tr. 407]).

- "[Jeff Simmons] nastily said, Well, Steve said it wasn't pushing the envelope." (Coyne Aff. Exh. A [Pl Tr. 428]).

Sammarco's anticipated testimony is, at a minimum, hearsay and likely double hearsay, and therefore should be precluded at trial. Fed. R. Evid. 802.

### G. *Testimony by Melissa Russo that She Knew Paulus "Would Get into Trouble One Day"*

According to her Proffer, Plaintiff will offer the testimony of Melissa Russo, a former co-worker, to the effect that Russo "told Adele that she [presumably Russo] *'knew Steve would get into trouble one day.'*" (emphasis in original).

Russo's proffered testimony is utterly irrelevant. Russo's subjective opinion of what the future held for Paulus does not have a tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. Therefore, this proposed testimony should be precluded.[12]

### H. *Testimony Concerning Consensual Conduct*

In her Amended Complaint and deposition testimony, Plaintiff has raised a host of allegations related to consensual interactions between NY1 employees, while adducing no evidence that such alleged conduct was unwelcome to those involved. Moreover, she admits that she did not complain about these incidents because they did not concern her. Because evidence of consensual interactions among employees at NY1

---

[12] Testimony as to Russo's alleged out-of-court comment to Sammarco would be barred for the additional reason that it is hearsay. Fed. R. Evid. 802.

is prejudicial and can have no probative value, any evidence concerning these allegations should be excluded.

Plaintiff alleges the occurrence of the following consensual conduct engaged in by the participants:

- Paulus regularly touched the thigh of a female NY1 assistant, Rose DelCastillo, during morning staff meetings. (Compl. ¶ 32(a)). According to Plaintiff, DelCastillo "was boasting [and] smiling" when she told Plaintiff about this behavior. (Coyne Aff. Exh. A [Pl. Tr. 328]). Sammarco never complained about this conduct because, by her own admission, "[i]t didn't involve [her]." (Coyne Aff. Exh. A [Pl. Tr. 328]).

- Paulus bragged in the newsroom about how he helped make it possible for couples to "hook up" at NY1. (Compl. ¶ 32(b)). Sammarco admits this behavior, "didn't concern me. I wasn't hooking up." (Coyne Aff. Exh. A [Pl. Tr. 386]).

- DelCastillo engaged in flirtatious messaging with Paulus; Paulus kissed DelCastillo outside a restaurant, took her out, left her telephone messages and sent provocative emails to her. (Compl. ¶ 32(f)). Plaintiff did not complain about Paulus kissing DelCastillo because "[i]t didn't involve [her]." (Coyne Aff. Exh. A [Pl. Tr. 326]).

- Paulus was observed kissing a high-ranking female NY1 employee, Bernadine Han (Compl. ¶ 32(e); Coyne Aff. Exh. A [Pl. Tr. 465]). Sammarco did not complain about this interaction because "[i]t wasn't about [her]." (Coyne Aff. Exh. A [Pl. Tr. 465]).[13]

Plaintiff should be precluded from offering any evidence regarding these alleged consensual interactions as they are wholly irrelevant to her claim of harassment, particularly where, as here, the alleged consensual relationship did not adversely affect Sammarco's working environment. *See Laurin v. Pokoik,* No. 02 Civ. 1938LMM, 2005 WL 2230457, at *3 (S.D.N.Y. Sept. 13, 2005) (excluding evidence of consensual affair

---

[13] In addition, Plaintiff raised two other supposed examples of consensual conduct during the depositions in this matter. First, Plaintiff's counsel asked Simmons if he ever had a relationship with School Chancellor Ramon Cortines. (Coyne Aff. Exh. H [Simmons Tr. 35]). Second, Plaintiff's counsel asked Ramsay about a consensual, sexual relationship he had with a then-former intern of NY1. (Coyne Aff. Exh. G [Ramsay Tr. 37-39]). Defendants also seek to preclude any testimony concerning these alleged consensual interactions.

31

because it is not relevant); *Cruz v. Oxford Health Plans, Inc.*, No. 03 Civ. 8863, 2004 WL 2609528, at *2 (S.D.N.Y. Nov. 17, 2004) (striking allegations regarding an alleged consensual sexual affair). As the court noted in *Cruz*, "the relationship [between plaintiff's supervisor and a co-worker] cannot be evidence of a pattern of discriminatory conduct, because there is no allegation that the affair was anything other than consensual." *Id.* It is axiomatic that conduct must be unwelcome to form the basis for a claim of harassment; because there is no evidence that the conduct Sammarco alleges was unwelcome to those involved, it cannot support Sammarco's claim that a hostile work environment existed. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("the gravaman of any sexual harassment claim is that the alleged sexual advances were unwelcome").

Indeed, Magistrate Judge Azrack has already ruled that such evidence of consensual relationships is not merely irrelevant but outside the scope of discovery. On November 20, 2006, during the course of Simmons' deposition, the parties contacted Judge Azrack regarding a question posed to Simmons regarding an alleged consensual relationship that Simmons supposedly had with Schools Chancellor Ramon Cortines. Sustaining Defendants' objection, Judge Azrack ruled that "the only way [she] would permit [Plaintiff's counsel] to ask about relationships people had at NY1 is if they then resulted in some kind of complaints of sexual harassment or something to do with improper conduct in the workplace." (Coyne Aff. Exh. H [Simmons Tr. 42]). The welcome conduct alleged in Plaintiff's Amended Complaint did not result in any complaint of sexual harassment or improper conduct in the workplace. Sammarco admits that even she did not bring these alleged incidents to the attention of NY1 because they did not involve or concern her. Under Judge Azrack's prior ruling, then,

testimony concerning any consensual relationships, where none resulted in a complaint, must be precluded.

Moreover, Sammarco's admission that these incidents did not concern her precludes her from relying upon these facts to support her claim of harassment. In order to establish an actionable hostile work environment, a plaintiff may not rely upon mere allegations that there was sexual behavior "in the air" or that other employees engaged in conduct of a sexual nature; the plaintiff must show, rather, that *she* was subjected to unwelcome sexual conduct, and that the conduct was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). Thus, a plaintiff who relies on incidents of alleged hostility directed at other persons must show that this conduct had an "adverse effect on the terms and conditions of [her] employment." *Parrish v. Sollecito*, No. 01 Civ. 5420 (VM), 2002 WL 1072227, at *2 (S.D.N.Y. May 28, 2002). Sammarco's repeated admission that this conduct did not concern or involve her is fatal to any claim based on that conduct.

Evidence concerning consensual relationships and interactions between other employees is also irrelevant to Sammarco's claims because such conduct was clearly not engaged in *because of* Sammarco's gender. *See Drummond v. IPC Int'l, Inc.*, 400 F. Supp.2d 521, 530 (E.D.N.Y. 2005) (where supervisor, *inter alia*, made comments to plaintiff about her own affair and about sexual relationship of other employees, this court noted, "At best the evidence here demonstrates that the work environment was equally unprofessional for both men and women."); *see also De Los Santos v. City of New York*, 482 F. Supp.2d 346, 356 (S.D.N.Y. 2007) ("Nor can the single consensual sexual act between [co-workers] – or their apparent ongoing affair – objectively be

considered sexual harassment."); *Parrish*, 2002 WL 1072227, at *2 (in striking
allegation of an extramarital affair between individual defendant and another employee
from the complaint, noting "[n]othing suggests that the alleged relationship between
[the supervisor] and the other employee constitutes . . . an instance of hostility or
harassment against that female employee."); *cf. Oncale v. Sundowner Offshore Servs.,
Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical
harassment in the workplace; it is directed only at 'discrimination . . . because of . . .
sex.'").

   In addition to the fact that evidence of consensual relationships between
co-workers is wholly irrelevant and without probative value, it is highly prejudicial to
Defendants and likely to confuse the issues, mislead the jury and needlessly delay the
proceedings, and should be precluded on these grounds as well. *See* Fed. R. Evid. 403.
The court's decision in *Stephens v. Rheem Manufacturing Co.*, 220 F.3d 882 (8th Cir.
2000), is particularly instructive. In *Stephens*, the plaintiff sought to introduce into
evidence at trial "rumors of sexual affairs among . . . management and employees." *Id.*
at 885. The Eighth Circuit upheld the District Court's exclusion of such evidence: "We
fully agree with the District Court that the admittance of such salacious rumor-based
evidence could have unduly prejudiced the jury against [the employer], and that this
danger of prejudice greatly outweighed the limited probative value of the evidence." *Id.*
The Circuit Court noted, "because consensual affairs and unwelcome sexual harassment
are entirely separate exploits, with distinct motivations and underlying conduct, the jury
could have reasonably concluded that the rumor evidence was wholly irrelevant." *Id.*

   Here, the jury is being asked to determine whether Plaintiff was subjected
to a hostile work environment, and evidence of consensual personal conduct between

other employees can only serve to muddy the waters and prejudice the jury, by permitting them to attach their own feelings regarding consensual, workplace relationships to conduct that is irrelevant to Plaintiff's claims. Notably, this Court has already stricken from the Complaint Plaintiff's allegations concerning Mr. Paulus' marital status and supposed "affairs" as gratuitous and scandalous. *Sammarco v. New York 1, et al.*, No. 02-CV-6239, Report and Recommendation (S.D.N.Y. Apr. 10, 2003). Likewise, all the alleged incidents of consensual conduct involving others should be excluded as well.

I. *Testimony by Plaintiff Concerning Alleged Harassment that She Did Not Witness*

In addition to precluding Plaintiff from offering her own testimony, or the testimony of others, concerning consensual conduct in the workplace, the Court should preclude Plaintiff from offering hearsay testimony concerning conduct (much of which was also apparently consensual) that she did not witness.

In her Amended Complaint, and during the course of her deposition, Plaintiff made numerous allegations concerning conduct that she did not witness but that she merely heard about from others.[14] Specifically, Plaintiff alleges that she was told about the following incidents:

- At a Christmas party, Paulus asked at least a dozen news assistants who they would rather sleep with and who had "bigger boobs" between Sammarco and another female NY1 reporter. Paulus announced that Sammarco had the "bigger boobs." (Compl. ¶ 31(a)).

---

[14] This alleged conduct must be precluded in accordance with Judge Azrack's November 20, 2006 ruling because none of the conduct alleged resulted in a complaint of sexual harassment and/or a complaint of improper conduct in the workplace. Additionally, much of this alleged conduct was consensual.

- When a female NY1 assistant's sister came to the newsroom, Paulus made numerous sexual remarks about the assistant's sister's breasts and later told the assistant that a male NY1 employee "wants to fuck your sister!" (Compl. ¶ 31(c)).

- Paulus gave the male managers at NY1 pens with naked women on them. (Compl. ¶ 32(c)).

- Landis regularly leaned his body over women in the news room in an inappropriate manner.  (Compl. ¶ 33(a)).

- Landis regularly put his leg near a female NY1 News assistant in a way that made her feel uncomfortable.  (Compl. ¶ 33(b)).

- Paulus regularly touched the thigh of a female NY1 assistant, Rose DelCastillo, during morning staff meetings.  (Compl. ¶ 32(a)).

- Paulus kissed DelCastillo outside a restaurant, took her out and left her telephone messages. (Compl. ¶ 32(f)).

- Paulus was observed kissing a high-ranking female NY1 employee, Bernadine Han (Compl. ¶ 32(e)).

Plaintiff admitted at her deposition that she did not witness any of the above conduct; she merely claimed that she heard about these incidents from others. (Coyne Aff. Exh. A [Pl. Tr. 90, 92, 316-317, 320, 327, 328-29, 330, 336-37, 451-52, 454-55, 459, 461, 465, 466, 468]).  Because such testimony from Plaintiff would be hearsay, Plaintiff should be precluded from testifying concerning any of these supposed incidents.  Fed. R. Evid. 802.

The Second Circuit's recent decision in *DeMarco v. West Hills Montessori*, No. 09-0499-CV, 2009 WL 3463778 (2d Cir. Oct. 29, 2009), makes clear that the hearsay testimony Sammarco would offer about these incidents is not admissible.  In *DeMarco*, the Second Circuit upheld the District Court's order precluding the plaintiff from testifying about her co-workers' statements concerning incidents of alleged harassment they had experienced.  *Id.* at *1.  The Second Circuit held, "[Plaintiff] was not entitled to testify as to what she heard from these employees in order to prove a

hostile work environment." *Id.*; *see also Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 190 n.8 (2d Cir. 2001) ("[T]his Court has held that a plaintiff's testimony that her co-workers told her of incidents of harassment by her employer outside of her presence is likely inadmissible hearsay."); *Howley v. Town of Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) (noting in the context of a summary judgment motion that at trial "testimony by [plaintiff] that other firefighters told her of certain statements" by the harasser would likely be inadmissible hearsay).

If Plaintiff were permitted to recount statements that were made to her about the above alleged incidents, she would be offering it "in evidence to prove the truth of the matter asserted," *i.e.*, that Paulus and Landis engaged in the conduct alleged. Such testimony is plainly hearsay and therefore should be precluded at trial. Fed R. Evid. 802.

J. *Testimony that Sammarco Was Blackballed in the Industry*

Defendants seek to bar any testimony by Sammarco or any other witness, including Richard Emery and Barish, concerning any alleged "blackballing" of Plaintiff in the broadcast journalism industry. Such testimony is inadmissible on numerous grounds, including that it would be hearsay, wholly speculative, and unduly prejudicial to Defendants.

Plaintiff alleges in paragraph 2 of the Amended Complaint that "[s]ince she left NY1, Sammarco has been unable to find a job in journalism – the one field that she has always loved – because she has been black-balled by her former associates at NY1." A brief review of the testimony Plaintiff proffers in support of this allegation readily reveals that none of it is admissible.

Plaintiff herself admitted repeatedly at deposition that she had no knowledge of whether any potential employers had spoken with NY1 and admitted that she never gave out Mr. Paulus' or Mr. Landis' names as references (Coyne Aff. Exh. A [Pl. Tr. 489, 491-493]). Accordingly, Plaintiff has no admissible testimony to offer on this point, other than her own self-serving speculation.

The proposed testimony of Emery, Plaintiff's former attorney and agent, fares no better. During his deposition, Emery testified that he spoke with John Miller, of Channel 7, the local ABC affiliate, and that "Miller has a very high opinion of Adele's abilities and thought that her revealing publicly the sexual harassment that occurred at New York 1 had caused her to be black-balled, as I understood it, and that he was trying to help her get out of the hole she was in." (Coyne Aff. Exh. D [Emery Tr. 89-90]).[15] Notably, this testimony does not even support Plaintiff's allegation that NY1 blackballed Plaintiff. According to Emery, Miller merely opined that the industry was inhospitable to Plaintiff because she had made public allegations of sexual harassment, not that anyone at NY1 had done anything to prevent Sammarco from getting a job.

Emery also testified that he told Jan Constantine, the General Counsel of Rupert Murdoch Media, that Plaintiff had "been black-balled in the business by her former employers at New York 1 and as a result, was not able to get a job . . ." (Coyne Aff. Exh. D [Emery Tr. 91- 92]). Emery admitted, however, that this assertion was based wholly on his personal belief[16] and on what Plaintiff told him, not upon any personal knowledge. (Coyne Aff. Exh. D [Emery Tr. 93-94]).

---

[15] Emery went on to contradict himself and later stated that "no one from Channel 7" had told him that Plaintiff had been blacklisted. (Coyne Aff. Exh. D [Emery Tr. 92]).

[16] Emery speculated that "I didn't believe for a minute that given the public nature of Adele's allegations, they did anything other than talk negatively about her to other people." (Coyne Aff.

Likewise, Plaintiff's social worker, Lucille Barish, has no personal knowledge regarding the alleged blackballing of Plaintiff; she testified only that "the fact that [Plaintiff] could not find a job, that was a very significant stress, which led us to believe that she had been blackballed in the industry." (Coyne Aff. Exh. B [Barish Tr. 110-111]).

### 1.  Emery's and Barish's Proposed Testimony Regarding Blackballing is Inadmissible Hearsay

Emery's testimony concerning what John Miller allegedly told him is inadmissible hearsay. *See* Fed R. Evid. 802.  Likewise, Barish's testimony regarding statements Plaintiff made about her job search -- the sole basis of Barish's speculative opinion that Plaintiff was blackballed -- are clearly inadmissible.  *Id.*

Courts have routinely rejected on hearsay grounds statements concerning supposed poor references. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (finding that employee's "statement as to what he 'was told' [by a potential employer as to why he was not hired] was hearsay that would not be admissible at a trial"); *Thomas v. iStar Fin., Inc.*, 448 F. Supp.2d 532, 535-36 (S.D.N.Y. 2006) (noting that plaintiff's allegation that a recruiter told him he had received a bad reference was inadmissible hearsay); *Hamilton v. Bally of Switzerland*, No. 03 Civ. 5685, 2005 WL 1162450, at *12 (S.D.N.Y. May 17, 2005) (noting that notarized letter from former co-worker stating that her new employer would not hire plaintiff because she "had received a negative recommendation from defendant because of the difficulties she had had" with her manager was inadmissible hearsay).  Plaintiff herein has far less reliable evidence than the statements repeatedly rejected by courts in this Circuit.

---

Exh. D [Emery Tr. 93]).

Accordingly, the testimony of Emery and Barish concerning the supposed "blackballing" should be barred under Federal Rule of Evidence 802.

> 2.    Testimony by Plaintiff, Barish and Emery Regarding the Alleged Blackballing is Wholly Speculative and Not Based on Personal Knowledge

Any testimony by Plaintiff, Barish and Emery concerning the purported "blackballing" is barred for the additional reason that these witnesses all lack any personal knowledge of why Plaintiff was unable to find another job as a reporter; their proffered testimony consists of nothing more than their own conjecture.

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. A witness has personal knowledge if he or she testifies from "general observation and knowledge, and not upon conjecture or hearsay." *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 764 (2d Cir. 1991).

It is clear that the only basis for the testimony of Plaintiff, Emery and Barish regarding Plaintiff's alleged blackballing is conjecture and naked speculation.

- Plaintiff admitted that she did not even list Paulus or Landis as references and responded "I don't know. That is my testimony, I don't know" when asked if she was aware of anything they had done to prevent her from finding employment after NY1. (Coyne Aff. Exh. A [Pl. Tr. 489, 492-493]).

- Emery admitted that he had no personal knowledge regarding the alleged blackballing, responding affirmatively to the question "other than what Ms. Sammarco told you, you don't have any knowledge derived from your efforts to Ms. Sammarco's behalf of her being black-balled in the industry?" (Coyne Aff. Exh. D [Emery Tr. 93-94]). He further admitted that his statements to Constantine were based on speculation concerning the relative success of other former NY1 employees in finding other employment and that "I didn't believe for a minute that given the public nature of Adele's allegations, they did anything other than talk negatively about her to other people," a statement that is clearly not based on any personal observation or knowledge. (Coyne Aff. Exh. D [Emery Tr. 93]).

- Barish's testimony is similarly framed in her "belief" that Plaintiff was blackballed, based solely on Plaintiff's inability to get a job. (Coyne Aff. Exh. B [Barish Tr. 110-111]).

In sum, while Plaintiff apparently attempts to blame NY1 for her inability to find employment as a reporter, the speculative and hearsay testimony she proffers in support of her allegation is inadmissible on its face.

A plaintiff's "bare assertion that he was unable to obtain employment after his termination . . . is not sufficient to support an inference that [the employer] provided negative references to potential employers or employment agencies." *Thomas*, 448 F. Supp. 2d at 536. Sammarco's "evidence" is similar to that rejected in the recent decision of *Memnon v. Clifford Chance US, LLP*, 667 F. Supp.2d 334 (S.D.N.Y. 2009). In *Memnon*, the plaintiff alleged that her former employer "blackballed" her by "providing 'back channel' negative information to prospective employers." *Id.* at *1. In granting summary judgment to the former employer on employment discrimination claims, the court found that the plaintiff "has produced not a scintilla of evidence that any such negative information or references were actually disseminated . . . to any prospective employer" and noted that the plaintiff had attempted to rely only on the fact that job opportunities had "mysteriously disappeared." *Id.* at 343. Similarly, without any proof as to any alleged actions by NY1 or its agents, the statements by Plaintiff and her witnesses regarding the alleged blackballing are all wholly speculative, and should be barred.

K. *Testimony by Emery Concerning Plaintiff's Equal Pay Claim*

In her Proffer, Plaintiff describes a portion of the testimony to be given by Emery, and listed under "Equal Pay," as follows: "Adele was paid less than male reporters similarly situated." Because Emery lacks personal knowledge on this

allegation and can only offer his impermissible lay opinion on this topic, his testimony should be precluded.

As noted above, Emery is Sammarco's former attorney and agent and was never employed at NY1. At his deposition, Emery did not recall representing any male NY1 employees in the context of their employment at, or contract negotiations, with NY1. (Coyne. Aff. Exh. D [Emery Tr. 14-15]). And, of course, Emery has not been designated as an expert of any kind in this matter.

Emery's views as to whether certain male reporters were "similarly situated" to Sammarco can only be lay opinion testimony. Lay opinion testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge . . . ." Fed. R. Evid. 701. Clearly, based on the fact that Emery did not represent any male reporters at NY1, his opinion as to whether they are "similarly situated" to Sammarco is not based on his own perception. Moreover, "*seldom* will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since *the jury's opinion is as good as the witness' and the witness turns into little more than an 'oath helper.'*"  *Hester v. BIC Corp.*, 225 F.3d 178, 184 (2d Cir. 2000) (internal quotations omitted) (emphasis in original).

Testimony from Emery as to his opinion that Sammarco was "similarly situated" to some number of "male reporters" would inappropriately usurp the role of the jury and should not be permitted.

L.   *Testimony by Plaintiff Concerning Incidents Involving Landis at His Prior Employer*

During her deposition, Plaintiff testified repeatedly concerning rumors and gossip she had heard about Peter Landis' actions during his prior employment at CBS. Because Plaintiff, who was never employed at CBS, lacks any personal knowledge of these supposed events, and any knowledge she purports to have can only be based upon inadmissible hearsay, Sammarco should be precluded from testifying concerning these topics.

Plaintiff offered the following testimony at her deposition about Landis:

- "His reputation preceded him from CBS to New York 1. He was known – the rumor or the scuttlebutt in the news room was that he was let out of a CBS [sic] on a stretcher. That you could get Peter only on his medication, or if he was off his medication – that he kicked waste paper baskets. That he had an explosive personality . . . . . I, of course, didn't know him. I didn't work with him at CBS." (Coyne Aff. Exh. A [Pl. Tr. 260]).

- "Peter Landis operated – and it was widely known that he operated on a pre-conceived bias. Peter Landis was fired from CBS News. It was widely known that he was – the rumor was that he was taken out of CBS by human resources. They called an ambulance and took him out on a gurney. He came to New York 1 News with that preconceived reputation of being a volatile, irrational news director who had a thing against certain women." (Coyne Aff. Exh. A [Pl. Tr. 556]).

- "[W]ith his history toward women in the news room, and I'm including the CBS news room where he came from, where he was fired from, along with Steve Paulus, they both were fired from CBS, that their treatment of women, their history came to the New York 1 news room, so it was there." (Coyne Aff. Exh. A [Pl. Tr. 568-69]).

By contrast, Landis, who has personal knowledge, testified at his deposition that he was not fired from CBS. (Coyne Aff. Exh. F [Landis Tr. 9]).

Plaintiff should be precluded from testifying about rumors or conjecture concerning Landis' prior employment at CBS.[17]  Plaintiff's deposition testimony makes

---

[17] To the extent that Sammarco may seek to testify concerning Paulus' prior employment at, and

plain that her "knowledge" concerning supposed events involving Landis at CBS is based on, as she puts it, "scuttlebutt" since, as Plaintiff also admits, she never worked at CBS. Because Plaintiff lacks personal knowledge concerning these events, and can only offer hearsay testimony, Sammarco should be precluded from testifying about this topic. *See* Fed. R. Evid. 602, 802.

M. *Testimony and Other Evidence Concerning Sammarco's Alleged Lost Wages Following her Resignation from Her Subsequent Employment*

Plaintiff should be precluded from offering any testimony or other evidence concerning her alleged lost wages following her voluntary resignation from her subsequent employer, The Council on the Arts and Humanities ("COAH") in November 2005.[18]

The purpose of back pay damages is merely to make a plaintiff "whole," *i.e.*, to put her in the place she would have been but for the unlawful discrimination. On the other hand, such "[d]amages in employment discrimination cases are not intended to insure a plaintiff's future financial success." *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir. 1992); *see also Ford Motor Co. v. EEOC*, 458 U.S. 219, 234 (1982) (court should not "catapult [the plaintiff] into a better position than [she] would have enjoyed in the absence of discrimination"). Thus, a winning plaintiff is required to "attempt to mitigate her damages by using reasonable diligence in finding other suitable employment." *Dailey v. Societe Generale*, 108 F.3d 451, 455 (2d Cir. 1997) (citation

---

departure from, CBS, that testimony should also be precluded.

[18] After voluntarily resigning from COAH in November 2005, Plaintiff obtained employment at the Snug Harbor Cultural Center, Inc. ("Snug Harbor") in December 2005. (Coyne Aff. Exhs. M, N). Plaintiff subsequently resigned that employment as well, on October 26, 2006. (Coyne Aff. Exh. O). As such, even were Plaintiff permitted to introduce evidence of her alleged lost wages following her 2005 resignation from COAH, such evidence should be precluded after October 26, 2006, the date of her voluntary resignation from Snug Harbor.

omitted).  In fact, such damages "should ordinarily extend only to the date upon which 'the sting' of any discriminatory conduct has ended."  *McKnight*, 973 F.2d at 1372 (quoting *Smith v. Great Am. Rests., Inc.*, 969 F.2d 430, 439 (7th Cir. 1992)); *see also McIntosh v. Irving Trust Co.*, 873 F. Supp. 872, 880 (S.D.N.Y. 1995) (same).

These principles establish that Plaintiff's claim for back pay ended with her voluntary resignation from COAH.  Plaintiff became employed by COAH on May 17, 2004.  (Coyne Aff. Exh. A [Pl. Tr. 11-12]).  Plaintiff resigned from that employment effective November 30, 2005.  (Coyne Aff. Exh. M).  Plaintiff's decision to resign from her employment at COAH constitutes a failure to mitigate her alleged damages and tolls any entitlement to back pay from the date of her resignation.  *See Hawkins v. 115 Legal Serv. Care*, 163 F.3d 684, 696 (2d Cir. 1998) ("[A] claimant who voluntarily resigned from comparable employment for personal reasons would not have adequately mitigated damages . . . .");  *see also EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992) (same).  As such, any testimony or other evidence concerning any supposed lost wages that Plaintiff experienced after her resignation from COAH are irrelevant and should be precluded.  Fed. R. Evid. 401.

## V.        Proposed Exhibits To Be Excluded

### A.    *The Fever Pitch Videotape and Related Testimony*

Plaintiff proposes to introduce into evidence a copy of a videotape of the movie "Fever Pitch." (PX 16).  The Court should preclude Plaintiff from introducing the videotape as an exhibit, and preclude Plaintiff from offering testimony concerning the videotape, because such evidence is irrelevant and, even if it were relevant, its probative value is substantially outweighed by the risk of unfair prejudice to Defendants.  *See* Fed. R. Evid. 402 and 403.

In her Amended Complaint, Plaintiff alleges that "[i]n December 2000, a videotape was placed in Sammarco's mailbox, with no note, that depicted a naked woman with soccer cleats covering her breasts.  Someone yelled 'you need to get laid!'  Then a group of nearby news assistants started laughing."  (Compl. ¶ 34(e))

At her deposition, Plaintiff testified as follows concerning the "Fever Pitch" video:

> I did get VHS videotape in my mailbox of a partially naked women [sic] with soccer cleats covering her breasts, all alone in my mailbox.
>
> When I went to pick it up, I heard the news assistants scream, You need to get laid, and laughter.

(Coyne Aff. Exh. A [Pl. Tr. 337]).

As an initial matter, Plaintiff should be precluded from offering the videotape itself as an exhibit in this case.   Plaintiff admitted in her deposition that she never watched the videotape and has no knowledge of its contents.  (Coyne Aff. Exh. A [Pl. Tr. 506]).  As such, the videotape is irrelevant.  Fed. R. Evid. 402.

Plaintiff should also be precluded from introducing the cover of the videotape, or any testimony concerning the tape or the circumstances under which she found the videotape.  Plaintiff's Amended Complaint and her testimony make clear that she does not know who put the videotape in her mailbox or who made the alleged comment, "You need to get laid!"  Such anonymous allegations, which are by their nature impossible for Defendants to rebut, have little, if any probative value, to whether Sammarco was subjected to a sexually hostile work environment for which Defendants can be held liable.  Moreover, the explicit nature of the picture and the alleged comment are likely to inflame the jury, and therefore unfairly prejudice Defendants.  Therefore,

the anonymous allegations concerning the videotape and the comment should be

excluded. *See* Fed. R. Evid. 403; *see also Callahan v. Consol. Edison Co. of N.Y.*, No.

00-cv-6542, 2005 WL 578889, at *3 (S.D.N.Y. Jan. 4, 2005) (plaintiff's allegation that

harasser authored anonymous letters concerning plaintiff not admissible), *judgment*

*vacated on other other grounds*, 2005 WL 936470 (S.D.N.Y. Apr. 22, 2005); *Bartniak*

*v. Cushman & Wakefield, Inc.*, 223 F. Supp.2d 524, 533 (S.D.N.Y. 2002) (undated

anonymous letter with nude photo attached properly excluded from trial where photo

was not shown in the workplace and any limited relevance exhibit would have would

have unduly inflamed jury).

    B.   *The Decision of the Administrative Law Judge of the New York*
        *Unemployment Board and Any Testimony By Plaintiff Concerning That*
        *Decision.*

        Plaintiff has proposed to introduce into evidence the decision of an

Administrative Law Judge ("ALJ") of the New York State Department of Labor

concerning Plaintiff's application for unemployment compensation following her

separation from NY1. (Coyne Aff. Exh. P) (PX 20) (the "Unemployment Decision").

Plaintiff should be precluded from introducing into evidence, or testifying concerning,

the Unemployment Decision because the decision is irrelevant to the matters to be

presented to the jury. Fed. R. Evid. 402. In addition, what limited probative value the

decision may have is substantially outweighed by the unfair prejudice the decision, and

any testimony about the decision, will cause to Defendants. Fed. R. Evid. 403.

        As an initial matter, the sole issue presented in the Unemployment

Decision was whether Plaintiff voluntarily left her employment or whether she was

terminated from her position and thus qualified to receive benefits. (*See* Coyne Aff.

Exh. P). NY1 did not even participate in the hearing leading to the Unemployment

47

Decision – no attorney or witness appeared on behalf of NY1 and no evidence was submitted by NY1 at the hearing.  And, significantly, Defendants do not dispute that Plaintiff was, in fact, terminated.  The outcome of a hearing determining whether Plaintiff was discharged or resigned is thus wholly irrelevant to Plaintiff's present claims.

"It is clear that unreviewed state administrative proceedings do not have preclusive effect with respect to claims brought under Title VII." *Arroyo v. WestLB Admin., Inc.*, 54 F. Supp.2d 224, 230 (S.D.N.Y. 1999), *aff'd*, 213 F.3d 625 (2d Cir. 2000) (internal quotations omitted).  Moreover, "an unemployment hearing officer's decision, though it may be admitted in a federal discrimination suit, normally should not be." *Id.* (internal quotations omitted).  The decision to exclude from trial the findings of administrative bodies is entirely within the trial court's discretion. *See Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 64 (2d Cir. 1998).  Here, sound discretion mandates exclusion of the Unemployment Decision, particularly because such decisions are inadmissible in court proceedings under New York law.  Section 537 of Article 18 of the New York Unemployment Insurance Law states that "Unemployment insurance information shall be for the exclusive use and information of the commissioner in the discharge of his or her duties under this chapter and shall not be open to the public *nor be used in any court in any action or proceeding pending therein unless the commissioner is a party to such action or proceeding . . . .*" McKinney's N.Y. Labor Law § 537(1)(b) (emphasis added).

The Second Circuit in *Paolitto* affirmed the trial court's decision to exclude from an age discrimination trial the factual findings of the Connecticut Commission on

Human Rights and Opportunities on the Plaintiff's charge of age discrimination filed with that agency. As the Second Circuit explained in *Paolitto*:

> the district court is in the best position to consider the quality of the report, its potential impact on the jury, and the likelihood that the trial will deteriorate into a protracted and unproductive struggle over how the evidence admitted at trial compared to the evidence considered by the agency.

151 F.3d at 65. The instant case is *a fortiori*. Here, unlike the *Paolitto* case where the agency finding concerned the same issue -- age discrimination -- tried before the jury, the issue in the Unemployment Decision -- *i.e.*, whether Plaintiff was involuntarily terminated -- is entirely irrelevant to the issues to be presented to the jury.

Even assuming *arguendo* that the Unemployment Decision has some limited probative value, that value is far outweighed by the unfair prejudice to Defendants if the Unemployment Decision was submitted to the jury or if Plaintiff were allowed to testify about the ALJ's findings at trial. Fed. R. Evid. 403.

This was exactly Judge Glasser's conclusion in *Abramowitz v. Inta-Boro Acres Inc.*, No. 98-CV-4139 (ILG), 1999 WL 1288942 (E.D.N.Y. Nov. 16, 1999), where the court granted the employer's motion *in limine* in an age discrimination case to exclude decisions of the Unemployment Insurance Appeal Board proffered by the plaintiff. The court in *Abramowitz* noted that there was no need to admit the unemployment decisions as the plaintiff would have a full opportunity to present to the jury all of the evidence that the plaintiff had submitted in the unemployment proceeding. 1999 WL 1288942, at * 7 (citing *Paolitto*, 151 F.3d at 65). Plaintiff in the instant matter will likewise have a full opportunity to present to the jury all of the evidence, and more, that she submitted to the ALJ.

In addition, the court in *Abramowitz* found that "the probative value of the [unemployment] Decisions in the circumstances presented here will be limited." 1999 WL 1288942, at *8. Most significantly, the *Abramowitz* court held that "[b]y contrast, the [unemployment] Decisions do pose a significant risk of unfair prejudice to the defendants." *Id.* The court explained that,

> [t]he Decisions contain factual conclusions that, if taken at face value, might reasonably be construed as foreclosing deliberation on whether the firing of plaintiff was pretextual. Because its finding on this issue will determine the jury's ultimate finding on liability under the ADEA, the Decisions would function, in effect, as a kind of vouching for plaintiff's evidence on pretextuality.

*Id.* The *Abramowitz* court noted that, "[f]or this reason, this Court does not believe a limiting instruction would effectively mitigate the unfairness." *Id.* at *8 n.3. (citation omitted); *see also Hamilton v. Niagara Frontier Transp. Auth.*, Nos. 00-CV-300SR, 00-CV-863SR, 2008 WL 4724324, at *5 (W.D.N.Y. Oct. 24, 2008) (in excluding unemployment insurance appeals board decision under Fed. R. Evid. 403, finding "[t]here is simply no reason to present the Appeals Board's determination of facts . . . to the jury when the jury can and should be presented with the same or better evidence to reach its own conclusion as to these important issues") (internal citations omitted).

Here, the Unemployment Decision, based on a one-sided proceeding in which NY1 did not even participate, presents the same danger of unfair prejudice to Defendants as it may suggest to the jury that they must reach the same findings as the ALJ, even though the jury will have been presented with far more evidence from both parties. The danger of this prejudice is underscored by the ALJ's conclusion, based on nothing other than Plaintiff's testimony, that "[d]uring the last year of her employment, she complained to the employer about being sexually harassed by her boss. In response

to her complaint, her boss in February 2001 informed her that she needed to look for another job." (Coyne Aff. Exh. P). Such a finding unquestionably could unduly influence the jury to conclude that it should find in favor of Plaintiff on her claims, particularly on her claim of retaliation.

For these reasons, the Court should exercise its discretion to exclude the Unemployment Decision regarding Plaintiff's unemployment compensation benefits, as well as any testimony by Plaintiff regarding the ALJ's decision.

### C.   *Community Awards and Other Irrelevant Compliments*

The Court should preclude Plaintiff from introducing evidence related to awards, honors, or complimentary letters (collectively "awards") that she claims to have received from various third parties, unrelated to NY1. (PX 1, 2, 4, 6, 7, 8, 9, 10(a), 10(b), 30). Any testimony, argument or presentation of any evidence about the awards should be excluded because (1) subjective opinions held by third parties are irrelevant; and (2) the probative value of such evidence, if any, is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

During the time Sammarco worked at NY1, she received a handful of awards, letters of compliment and the like from an eclectic group of outside organizations, documents related to which now appear on Plaintiff's list of proposed exhibits:[19]

- A January 6, 1995 letter, containing thanks and complaints, from Ed Watkins;

- A December 12, 1994 letter of thanks from Rabbi Moshe Katzman;

- A June 1997 "Distinguished Graduate Award" from P.S. 11 in Staten Island;

---

[19] Plaintiff also testified that she was recognized by the Natural Resources Defense Council, although no document related to this award appears on Plaintiff's exhibit list. (Coyne Aff. Exh. A [Pl. Tr. at 660]).

- A November 1999 document reflecting Sammarco was one of a number of New York journalists who received the William Moses Kunstler Racial Justice Award.

- An April 2000 award from Fieri National, along with a portion of a program from a Fieri event;

- A February 1997 letter from the Girl Scout Council of Greater New York, Inc. asking that Sammarco speak at a Career Day;

- A letter noting Sammarco had agree to appear as a celebrity bartender at a benefit for the Muscular Dystrophy Association; and

- An October 2003 award from "Mothers of The New York Disappeared" for "Outstanding Achievement in Promoting Racial & Social Justice."[20]

None of these awards came from anyone at NY1. In fact, the majority of these awards appear to have only a tenuous connection, at best, to the fact that Sammarco was a reporter.

These awards are irrelevant to any of the issues to be presented at trial. In determining whether NY1's proffered reason for its decision not to renew Plaintiff's contract -- its evaluation of her performance -- is pretextual, the opinion of Plaintiff's character or performance held by third parties who had nothing to do with NY1, is wholly irrelevant. And, if admitted, evidence of these awards is likely to mislead the jury and cause confusion of the issues.

1.    Plaintiff Should Be Precluded From Introducing Any Evidence Of The Awards Because They Are Irrelevant

Defendants contend that NY1 declined to renew Sammarco's contract because of dissatisfaction with her work performance. Sammarco may not rebut Defendants' proffered reason for discharging her through awards granted by third-party organizations.

---

[20] This Award should also be excluded because it is dated over two years after Plaintiff's

Under Rule 401, perceptions of third parties are irrelevant because they do not have a "tendency to make the existence" of pretext more or less probable. Fed. R. Evid. 401. In determining whether a plaintiff has proven pretext, the opinion of plaintiff's performance held by outsiders is irrelevant. Rather, it "is the perception of the decisionmaker that is relevant." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464-65 (7th Cir. 1986), *cert. denied*, 479 U.S. 1066 (1987). As one court stated:

> In response [to the employer's proof of poor performance], [Plaintiff] offers only the judgments of some who thought his work was good. These contrary assessments of his performance do not impeach the legitimacy of his employer's expectations. Plaintiff does not raise a material issue of fact on the question of the quality of his work merely by challenging the judgment of his superiors.

*Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1223 (7th Cir. 1980), *cert. denied*, 450 U.S. 959 (1981).

As an initial matter, there is no indication that many of these awards were even commendations on Sammarco's skills as a journalist. Even the few awards that do appear to be even tangentially connected to Sammarco's work as a reporter are irrelevant because these organizations played no part in any evaluation of Sammarco's work performance. Courts have routinely rejected attempts by plaintiffs to rely upon third-party testimonials of the type Sammarco is attempting to introduce. For example, in *Franklin v. Greenwood Mills Mktg. Co.*, 33 Fair Emp. Prac. Cas. (BNA) 1847, 1983 WL 563 (S.D.N.Y 1983), the plaintiff was terminated for poor sales performance. At trial, several customers testified that the plaintiff enjoyed a good rapport with them and was an excellent salesperson. The court granted the employer's motion for judgment notwithstanding the verdict, finding that the customer testimony supported neither

---

employment with NY1 ended.

plaintiff's *prima facie* case, nor his claim of pretext.  The court noted that an employer

and a third party may have very different ideas about what constitutes good

performance:

> [I]t is apparent that an employer and customer may legitimately
> differ with respect to the ability of a salesman; that even an
> unusually enthusiastic appraisal of a salesman's ability by one or a
> few customers may not sway an employer from a decision to
> discharge if the salesman were deficient in other important respects
> such as overall sales.

*Id.* at 1854.  *See also  Miller v. Beneficial Mgmt. Corp.*, 776 F. Supp. 936, 969 (D.N.J.

1991), *rev'd on other grounds*, 977 F.2d 834 (3rd Cir. 1992) (letters of commendation

from clients irrelevant to pretext claim).  In short, the only relevant opinion is that of the

decisionmaker.

For all of these reasons, the awards have no relevance and should be

barred from evidence.

2.   The Danger of Confusing and Misleading the Jury Far
     Outweighs Any Probative Value

Any limited probative value these awards may have is substantially

outweighed by the risk of unfair prejudice to Defendants and this evidence should

therefore be excluded under Federal Rule of Evidence 403.

When presented with awards from third-party organizations, the jury will

likely presume, mistakenly, that they are evidence that Sammarco was a competent or

successful reporter.  The jury will be drawn into a confusing and time-consuming

evaluation of the competing views of the NY1 decisionmakers – which are relevant – and

the supposed view of outsiders, unconnected to NY1, whose criteria, agenda, and

expertise is unknown.  By admitting these awards, the Court would effectively invite the

jury to evaluate who correctly evaluated Plaintiff's performance – NY1 or these unrelated outsiders; as such, their admission would fly in the face of the well-settled rule that a court may not second-guess an employer's business judgment. *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions.") (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)); *Davidson v. Time Inc.*, 972 F. Supp. 148, 153 (E.D.N.Y. 1997) ("Title VII may not be used as a vehicle for second-guessing an employer's business judgment."). Therefore, the awards should be precluded under Federal Rule of Evidence 403.

### D.   The "Sample Reels" of Plaintiff's On-Air Appearances

Plaintiff has created two "sample reels" of a limited number of her on-air performances and seeks to introduce her self-selected hodgepodge of performances into evidence. (PX 45, 46). Plaintiff should be precluded from offering the sample reels into evidence because they are irrelevant and because they would mislead and confuse the jury. Fed. R. Evid. 402, 403.

Defendants anticipate that Plaintiff will seek to introduce into evidence the "sample reels" of her on-air appearances, DVDs created solely for purposes of this litigation, to contradict Defendants position that Plaintiff's performance was inadequate. The sample reels span multiple years of Plaintiff's employment and were compiled by Plaintiff undoubtedly to depict what she views to be her best work.

Upon viewing the sample reels, the jury will likely mistakenly presume that the sample reels are representative of Plaintiff's work at NY1. To the contrary, the sample reels reflect only the particular examples of Plaintiff's work, taken from various years, that she wants to highlight. Moreover, the sample reels do not reflect the behind-

the-scenes elements of the selected on-air performances – including the number of takes Plaintiff required to complete a performance and the editing that was done.  The sample reels will invite the jury to confuse the final work product that was broadcast on NY1 with the initial, unvarnished work of the reporter and to second-guess the evaluation of the decisionsmakers at NY1 that Sammarco's work was unsatisfactory. Because only the view of Plaintiff's performance held by the decisionmakers is relevant and because the sample reels will mislead and confuse the jury, they should be excluded. Fed. R. Evid. 402, 403; *see also Taylor v. Polygram Records*, No. 94 Civ. 7689(LSH), 1999 WL 124456, at *10 (S.D.N.Y. Mar. 8, 1999) (plaintiff could not demonstrate pretext by "parsing the details of selected incidents").

> E. *Misleading Instant Message Exhibit*

Plaintiff seeks to introduce into evidence at trial an incomplete document that allegedly contains reproductions of portions of certain electronic instant messages. (Coyne Aff. Exh. Q) (PX 22).  Under Rule 901 of the Federal Rules of Evidence, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a);  *see also generally U.S. v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001).

The two-page "document" that Plaintiff seeks to admit into evidence consists of what appear to be 13 instant messages sent from three different authors on two different dates; it is not clear to whom these messages were sent or whether there were intervening messages that were not included in the purported exhibit.  In addition, the messages contained in the "exhibit" reference, it seems, a number of different subject matters, such as a "blooper reel," a "bellevue story," and a "hisp[anic] story."

This document appears to be a random assortment of "instant messages" and should be excluded as misleading and incomplete. *See Barlow v. Connecticut*, 319 F. Supp.2d 250, 257 (D. Conn. 2004) *aff'd*, 148 Fed. Appx. 31 (2d Cir. 2005) (in context of summary judgment motion, striking from the record exhibits that were single pages of multi-page documents); *Coates v. A C and S, Inc.*, No. 90-1448, 1994 WL 34048, at *2 (E.D. La. Jan. 26, 1994) (sustaining objection to the introduction into evidence of a document "on the basis that this is an incomplete document and perhaps the document in its complete form would not support [the plaintiff's conclusion].")

In addition, although it is not clear for what purpose Plaintiff seeks to admit the incomplete document, it likely consists of nothing more than inadmissible hearsay to the extent that it is "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. No exception to the hearsay rule conceivably applies, so this exhibit must also be excluded on that basis.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motions *in limine* and such other further relief as the Court may deem just and proper.

Dated:   New York, New York
         March 15, 2010

PROSKAUER ROSE LLP

By:   __/s/_____
        Bettina B. Plevan (BP-7460)
        Keisha-Ann Gray (KG-3464)

1585 Broadway
New York, NY 10036-8200
(212) 969-3000

KAUFF McGUIRE & MARGOLIS LLP

By:___/s/_____
        Kenneth A. Margolis (KM 9127)
        Michele A. Coyne (MC 1795)
        Shelby Silverman (SS 0114)

950 Third Avenue, 14th Floor
New York, New York 10022
(212) 644-1010

Attorneys for Defendants