UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

ADELE SAMMARCO,

               Plaintiff,

      -against-                              02 Civ. 6239 (RM) (JMA)

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS MOTIONS IN
LIMINE**

NEW YORK 1, PETER LANDIS, STEVE
PAULUS, and ELIZABETH FANFANT,

               Defendants.

_____X

     Plaintiff, Adele Sammarco, by her attorneys, Law Office of Andrew C. Laufer, PLLC, Popick, Rutman, & Jaw, LLP, and Tacopina, Siegel, and Turano, P.C., respectfully submit this memorandum of law and the accompanying affirmation of Andrew C. Laufer, Esq. ("Laufer Aff.") dated March 17, 2010 and declaration of Adele Sammarco ("Sammarco Decl.") dated March 17, 2010, in support of her opposition to defendant's motions in limine to exclude certain, witnesses, testimony and proposed exhibits from admission at trial.

     The plaintiff, Adele Sammarco, was an accomplished award winning reporter for NY1 from 1992 until 2001.

     Plaintiff brought an action under Title VII alleging that she suffered severe instances of sexual harassment, discrimination, retaliation, and pay disparity within the course and scope of her employment with NY1.

     Defendants deny the aforementioned and claim they had non-discriminatory reasons for plaintiff's termination.

## **LEGAL STANDARD**

"Evidence is relevant if it "has tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Only relevant evidence is admissible. Fed.R.Evid. 402. See generally, e.g., United States v. Malpeso, 115 F.3d 155, 162-63 (2d Cir.1997).  See also U.S. v. Clarke 390 F.Supp.2d 131 D.Conn., (2005).

In general, relevant evidence is admissible and determining whether evidence is relevant is construed liberally.

"The basic evidentiary standard of relevance should be interpreted liberally."  Fed.Rules Evid.Rule 401, 28 U.S.C.A. See U.S. v. Ferguson, 246 F.R.D. 107, 74 Fed. R. Evid. Serv. 1278. (2007).

Relevant evidence may be precluded in the event its probative value is substantially outweighed by its prejudicial effect.  See Fed.Rules Evid.Rule 403, 28 U.S.C.A.  However, the prejudice must be *substantial.*

"For relevant evidence to be excluded on grounds that probative value is substantially outweighed by danger of undue prejudice or other considerations, the imbalance must be substantial." Fed.Rules Evid.Rule 403, 28 U.S.C.A.  See Gonzalez v. Digital Equipment Corp. 8 F.Supp.2d 194, 49 Fed. R. Evid. Serv. 445, Prod.Liab.Rep. (CCH) P 15,271 E.D.N.Y., 1998.

Moreover, protection from potentially prejudicial evidence does not extended to relevant evidence which is merely detrimental to a party-opponents case.

"The rule which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion does not offer protection

against evidence that is prejudicial in the sense of being detrimental to a party's case; rather, the rule protects against evidence that is unfairly prejudicial." <u>Fed.Rules Evid. Rule 403, 28 U.S.C.A.</u> See <u>Carter v. Hewitt</u> 617 F.2d 961, 5 Fed. R. Evid. Serv. 1184 C.A.Pa., 1980.


## <u>PLAINTIFF'S RESPOPNSE TO DEFENDANT'S PROPOSED PRECLUSION OF WITNESSES</u>

<u>Amy Boon</u>

Ms. Boon's testimony is relevant evidence in that she witnessed the conversation with Dan Forman and Kenny Plotnick related to the plaintiff's interview with WABC New York, Channel 7.   Specifically, she recalls Ms. Sammarco appearing for the interview at Channel 7 and had a long conversation with Dan Forman about the plaintiff and her interview. Ms. Sammarco went back for a second interview with Channel 7 and was verbally offered a position by Kenny Plotnik.  Dan Forman stopped Mr. Plotnik and stated in front of Amy Boon and Ms. Sammarco, "Stop, she had problems at NY1, I'm a new news director here and I don't want any problems!"

After the second interview, Ms. Sammarco returned to the NY1 office and was called up to Steve Paulus's office.  When she entered the defendant's office, he immediately stated, "How did your interview at Channel 7 go?", inferring he spoke with Dan Forman and convinced him not to hire her.

Ms. Boon will also testify to defendant Paulus's use of sexually vulgar language in the news room as well as his inappropriate relationship with a subordinate, Rose Del Castillo.  The aforementioned is clearly relevant as to the plaintiff's retaliation and hostile work environment claims.

Enez Paganuzzi

Plaintiff's enhanced witness list described two potential subjects of testimony by this witness.  Delving deeper into the substance of Ms. Paganuzzi's testimony, plaintiff will show that Ms Paganuzzi was a supervisor at NY1 during the time period in question. She will testify that she was the individual who NY1 management, specifically Elizabeth Fanfant, sent to Albany during the Amadou Diallo trial.  At that trial, Ms. Sammarco was repeatedly referred to as "BBB" or "Big Butt Booty" by the camera and truck crew.  Ms. Paganuzzi will give testimony that she was sent not to "deal" with the hostile work environment the plaintiff was subject to This testimony negates the defense that the company was trying to investigate Adele Sammarco's claims and resolve any problems related thereto.

Ms. Paganuzzi suggested to Jeff Simmons that the enhanced breast image of the plaintiff "was not a good idea".  She was a part of management at NY1 and infers that management had knowledge of the photograph prior to its initial dissemination at the company picnic.

Jimmy Breslin

After being interviewed at NY1, Mr. Breslin, who is not an employee of NY1 but a highly respected news reporter and author, came upon the enhanced breast image one afternoon within the NY1 news room.  He then spoke about it with Adele while she drove driving him home.  At the time Ms. Sammarco was visibly upset.  Mr. Breslin witnessed, first hand, the effect this image had on Ms. Sammarco and observed its dissemination within the NY1 news room which supports the plaintiff's claim of hostile work environment and attendant psychological damages.  His testimony is relevant, non-prejudicial, and non-cumulative.  He is the only non-NY1 employee that plaintiff can identify who viewed said photo on or about the

time of its initial disclosure and is aware of the plaintiff's state of mind at the time period of the photo's dissemination.

John Miller and Dennis Sheehan

Statements regarding whether a person was "blackballed" within his profession have been held not to violate the hearsay laws.

In Ronde V. Gaytime Shops Inc, 239 F.2d 735 (2nd Cir 1956). The court found admissible the plaintiff's testimony that he was told by a prospective employer that he was "black balled by your last employer" and was refused the job.

Defendants objected to the evidence as hearsay, offered to prove the motive of employers. The court overruled the objection.

The Court Stated:

The testimony was offered to prove the motive of these prospective employers if hearsay, it comes within a well defined exception to the rule , Lawlor v. Loewe, 1915, 235 U.S. 522, 536 35 S. CF. 170, 59 L.FD 341; Wigmore, Evidence &1729, vol. VI (3rd Edition), although some authors would not even consider this as hearsay . Richardson &211 (FR Edition, Prince).

John Miller, helped arrange the plaintiff's interview with Dan Forman at Channel 7 News. He was told specifically that Mr. Forman would not hire the plaintiff due to her dispute with NY1 News. He confirmed with Dan Forman that the reason for the plaintiff not being hired was due to her dispute with the defendants. This testimony would also fall under the hearsay exceptions denoted in FRE 803(1) and FRE 807.

Mr. Sheehan's testimony is vital to the plaintiff's retaliation claim. He has firsthand knowledge of plaintiff's job search within the news industry. He was told by the people in the position of hiring that no one would hire Ms. Sammarco because of her allegations against NY1.

Defendants regard this evidence as potential hearsay or double hearsay, however, this court has held that "(d)ouble hearsay is admissible if each level of hearsay satisfies a hearsay exception." Fed.Rules Evid.Rule 805, 28 U.S.C.A  See U.S. v. Carneglia, 256 F.R.D. 384 28 U.S.C.A EDNY (2009).  Plaintiff believes that this would not be considered double hearsay because statements by these individuals were made directly to Mr. Sheehan.

This testimony may fall under the residual exception to the hearsay rule.  "To be admissible under residual exception to the hearsay rule, the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice, and notice. Fed.Rules Evid.Rule 807, 28 U.S.C.A."  See See U.S. v. Carneglia, 256 F.R.D. 384 28 U.S.C.A EDNY (2009).

The plaintiff would be required to call several witnesses in order to obtain a firsthand account of the numerous conversations that Mr. Sheehan had with potential employers would be unduly burdensome.  Moreover, Mr. Sheehan credibility as to this evidence would be subject to the cross-examination of the defendants and the scrutiny of the jury.  See FRE 806.

This testimony also falls under the present sense impression hearsay exception and is relevant.  FRE 803(1).  Present sense impression is defined as "(a) statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."


Eric Adams, Patrick Lynch, and Randy Credico

These witnesses will be offered primarily as rebuttal witnesses to defendant's argument of non-discriminatory termination.

Senator Adams is being offered to testify to the results of the plaintiffs work.  He was the head of a 100 Blacks in Law Enforcement.  He may be called to testify as to his numerous professional interactions with plaintiff in his role as a Lieutenant in the NYPD.  Senator Adams had experience with much of the New York media and will describe his professional conduct with Ms. Sammarco including an undercover expose on livery cab drivers who were being shot and killed around the city.   Ms. Sammarco and Senator Adams were instrumental in implementing improved safety measures in livery cabs.  He was a frequent NY1 guest on "Inside City Hall" and "Inside City Hall" Dominic Carter's political show.  He was used by Ms. Sammarco and NY1 as an expert on police brutality cases, CCRB complaints, and race relations within the NYPD.

Plaintiff, as the NY1 criminal justice reporter developed a reputation within the NYPD for her honesty and balance in reporting.  Patrick Lynch and Senator Adams will both testify that members of the NYPD would often turn to her with exclusive tips and leads on stories because of this reputation.  Patrick Lynch would prefer to interview with Ms. Sammarco because of this reputation and her work product.

Randy Credico, a political activist and is the Director of the William Moses Kunstler Fund for Racial Justice.  The fund targeted issues of injustice that affected communities of color.  The major focus of the fund was on the war on drugs and the Mothers for the Disappeared.  He assisted Adele with her story to free a young woman impressed under the Rockefeller Drug Laws which led to Adele receiving a William Kunstler citation for Excellence in Journalism.  Mr. Credico will testify to Ms. Sammarco's tenacity in reversing the conviction.  Mr. Credico was also a frequent guest on NY1 news as an expert on criminal justice and prisoner rights.

These individuals who are prominent citizens in the community will simply tell the truth. It is unknown how the defendants could possibly perceive this testimony as prejudicial or irrelevant.    See Fed.Rules Evid. Rule 403, 28 U.S.C.A. See Carter v. Hewitt 617 F.2d 961, 5 Fed. R. Evid. Serv. 1184 C.A.Pa., 1980.

## Lucy Barish Testimony and Notes

### Lucy Barish's Testimony should not be precluded

Defendants argue that Lucy Barish's testimony be precluded pursuant to FRCP 26(a)(2)(B). This argument is frivolous and wastes the court's valuable time in having to read and consider same.

Plaintiff is not required to provide a FRCP 26(a)(2)(B) expert disclosure and report for Lucy Barish, plaintiff's treating health care worker.

Lucy Barish is a New York State licensed clinical social worker. Pursuant to New York Education Law 7701(2), a licensed clinical social worker is authorized to treat mental health issues. New York courts have held that a licensed clinical social worker is qualified to testify regarding the diagnosis and prognosis of a patient's mental condition and to render an opinion regarding the cause of that condition. Ridley v. Ridley 275 AD2d 941, 714 NYS2d 396 (4th Dept. 2000).

The court in People v. R.R. 12 Misc 3d 161, 807 NYS2d 516 (Sup Ct. NY County 2005) recently tackled the issue of whether licensed clinical social workers and psychologists can evaluate, make and render diagnosis and prognosis, formulate treatment plans for the treatment of mental disorders or of mental, emotional and behavioral symptoms. The court found that the

legislature empowered these professions with such functions, pursuant to an amendment to Education Law 7701.

It has also been held that certified social workers may be appointed to examine criminal defendants for the purpose of rendering opinions as to their mental condition with regard to the affirmative defense of lack of criminal responsibility by reason of mental disease or defect; and to provide expert testimony as to current mental status and future prognosis. People v. Scala 128 Misc2d 831, 491 NYS 555 (N.Y Sup 1985)

The New York state courts have found that a clinical social worker "may within the scope of their license, make diagnostic assessments of a person's medical conditions and may qualify as an expert in the diagnosis of mental disorders. People v. Gans 119 Misc 2d 843, 465 NYS2d 147 (Sup Ct. NY County 1983).

The FRCP 26 (a)(2)(B) disclosure rules are clear that a treating doctor does not need to be disclosed as an expert. Ms. Barish is the plaintiff's treating mental health care provider and fits within the treating doctor exception to the expert exchange.

The Federal Courts have long held that the "treating physician" may testify as an expert witness without providing a written report pursuant to FRCP 26 even where the physician's testimony goes beyond specific treatment offered and includes such issues as causation and future treatment. Shapardon v. West Beach Estates 172 FRD 415 (D of Hawaii 1997).

The "treating doctor" exception is followed by the New York District Courts. The exception was discussed in Zanowic v. Ashcroft , W L 826878  (SD NY 2002). The court in Zanowic quoted, that advisory committee notes to the 1993 Amendments to the FRCP for the proposition. That "it is well settled that a treating physician is not subject to the disclosure obligations get forth in FRCP 26(a)(2)(B). The court stated:

The Advisory committee notes provide, in pertinent part:

For convenience, Rule 26(a)(2) continues to use the term "expert" to refer to those persons who will testify under Rule 702 of the Federal Rules of Evidence with respect to scientific, technical, and other specialized matters. The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony. A treating physician, for example, can be deposed or called to testify at trail without any requirement for (sic) a written report.

The court in <u>Zanowic</u> set forth a test for determining whether a doctor is a treaing doctor or an expert. The court stated:

The law is not well developed as to what makes a physician a "treating physician". The critical factor in determining whether a physician is a treating physician appears to be why the physician was retained. The Advisory Committee Notes to the 1993 Amendments state that "The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony. Thus, whether a physician is a treating or consulting physician appears to turn on why the patient saw the physician – for treatment or for testimony.

The Advisory Committee insert notes leave open those parties who do not fall within the "expert" category cites physicians as an example. Thus, other potential witness who will render opinions may not be considered as an expert.

In <u>Mangla v. University of Rochester 168 FRD 137 (1996)</u> , in which the issue was whether a  doctor was to be compensated as an expert or a treating doctor for his time at a deposition, the court differentiated between  "treating physician" and expert physician. The court held that a treating doctor testifying to their personal consultations with a patient are not considered expert witness pursuant to FRCP 26. The court also held that merely because treating physicians may be asked at deposition to offer opinions based on their examination of their patient does not mean that treating physicians do not have an opinion as to cause of an injury based upon their examination of the patient or to the degree of injury in the future and these opinions are a necessary part of the treatment of the patient and such opinions do not make the treating physicians experts for purposes of compensation of deponent.

In Byrne v. Gracious Living Industries, 2003 WL 446474 (SDNY 2003) the court denied

defendants motion in limne to preclude plaintiff's treating physician from testifying because he

did not exchange an expert report.

The court in Byrne followed the rule that:

"so long as the physician's opinion was acquired directly through treatment of the patient, it is not expert testimony for purposes  of Rule 26(a)(2)(B). Thus, to the extent that a treating physician testifies only to the care and treatment of the patient, the physician is not considered to be a specially employed expert and is not subject to the written report requirements of Rule 26(a)2(B). Moreover, so long as this criterion is met there is no limitation on the scope of the opinion rendered. Opinions as to causation have been permissible."

In Green v. McAllister WL 2207024 (SDNY 2005), the court permitted a treating

physician to testify regarding the causation element of a toxic tort claim without an expert

disclosure or previously disclosing the opinion. The court allowed the testimony because the

opinion was formed during the course of treatment.

In Lamere v. NYS office for the Aging 223 FRD 85 (ND NY 2004), the court reviewed

the issue of the scope of a treating physician's testimony without the reporting requirements of

26(a)(2)(B). The court summarized the holding of many cases that allowed the treating physician

to render opinions based upon facts learned during the course of treatment. The court discussed

Green Field v. Memorial Sloan Kettering Hospital 2000 WL 351395 (SD NY 2000) where it was

held a treating physician can testify to anything that comes within their professional care such as

probable causes, past and present conditions and future treatment and such testimony can include

explanation of technical medical terms.

Ms. Barish initially saw the plaintiff for treatment purposes prior to the alleged events

giving rise to the claims presented in this lawsuit.  The treatment and consultations continued

between plaintiff and Ms. Barish after the events in question.  Ms. Barish, as a licensed clinical

social worker is empowered to give opinions regarding the cause and prognosis of a patient's

mental health condition.  She was not retained as an expert specifically for this trial.  Therefore, she meets all the criteria for the "treating doctor" exception of the expert rule.

In addition, Ms. Barish was deposed at length.  Defendants questioned Barish regarding her treatment, opinions and prognosis of plaintiff.  The requirement of the expert exchanges usually goes to the ability to question a witness at deposition.  Defendants never claimed prejudice by doing the deposition without the benefit of a report.


### BARISH'S NOTES ARE ADMISSABLE AS A BUSINESS RECORD

Defendant's argument that plaintiff's statements to Barish constitute hearsay is also frivolous.   Defendant misconstrues the "Contemporaneous with" concept to support its merit less argument.  Defendant cites Turner v. White, 443 F.Supp. 2d 288, 298 (E.D. NY 2005) in support of it's proposition.

The facts in Turner bear no resemblance to the facts in the instant case.  In Turner, the plaintiff was a parolee who brought a 42 U.S.C.  1988 cause of action.  One of his allegations were that his head was shoved against a wall by a parole officer.  Plaintiff claimed he suffered seizures as a result. The plaintiff did not intend to call a doctor at trial to establish casual connection between the head injury and the seizures.

The plaintiff attempted to get around the lack of a physician by introducing the notes from his psychiatrist in which he states to the doctor that he thought his convulsive disorder was related to the probation officer injuring his head.

The court noted that "It does not appear that his statement was relied on by the physician in his decision to treat the plaintiff and thus the statement would fall outside the scope of rule

803(4)". (Statements for purposes of medical diagnosis or treatment exception to the hearsay rule).

In Turner, there was no mention of whether the plaintiff treated continuously with the doctor from the time of the alleged the assault by the probation officer.

In general, a doctor's medical records fall within the business records exception to the hearsay rule.

The court in Gissinger v. Yung 2007 W L 2228153 (EDNY 2007) stated:

If properly authenticated and created in the regular course of business contemporaneously with the occurrence by a person with knowledge, medical records can be admissible as business records. (Cites Omitted). Dr Sasson's affidavit states that the records kept by his office were prepared in the regular course of business by Mr.Gissinger's treating physicians for the records bear the same dates as the dates of Mr. Gissinger's visits.

The "Contemporaneous with" criteria is related to the time of the statement is made and the recording of the statement.

In the instant case the plaintiff's comments were contemporaneously made with the treatment and the treatment started contemporaneously with the events which form the basis of the plaintiff's cause of action.

Defendant seems to be imposing some sort of unrealistic test that all of a plaintiffs observations and complaints must be given at an initial exam. It should be up to the doctor to give reasons why she believed the statement were consistent with symptoms and conditions she was treating.

Plaintiff acknowledges that the court has a gate keeping role and can make finding's regarding the trustworthiness of the method of making the records. For example in Evans v. Consumer Tafo & Dispute Resolution, 2006 WL 120 9904 (SDNY 2006), the court stated "However, if the source of information or the method or circumstances of preparation indicate

lack of trustworthiness, such records may be excluded" referring to medical record admitted under FRCP 803(b). In the instant case there is no reason to believe that the method or circumstances of Barish's preparation of records indicate a lack of trustworthiness.

The nature of the relationship between Barish and plaintiff entails a certain type of back and forth conversation and imparting of information.

Defendant's argument that any incidents that plaintiff described to Barish after Barish diagnosed PTSS should be precluded is also without merit. Barish still has a responsibility to delve into plaintiffs psyche to determine the nature and extent of the PTSS and determine how to treat same.

Further there is nothing to indicate that the plaintiff fabricated the information contained in the statements. For example, plaintiff still has the video tape of the movie "**Fever Pitch**" which depicts on the cover a woman whose large breasts are covered with soccer cleats.  This video was given to plaintiff in the work place simultaneously with humiliating comments being made.

Defendant also mischaracterizes certain statements claiming that they were made due to self serving motivation related to the lawsuit. This is a big stretch on defendant's part to claim to know what plaintiff was thinking and why she was commenting on events. Since her comments were made in 2001, the events and circumstances still on her mind and needed to be discussed. This is a subject for voir dire of the witness or cross examination.

Under defendant's theories a patient's treatment ends with the commencement of litigation.

Defendants also seek to prelude Barish claiming that her testimony and records have are highly prejudicial and mischaracterizes Ms. Barish's testimony as "lay testimony". Barish is

plaintiff's mental health care provider and as such she developed opinions and strategies to treat plaintiff.

This author is aware of defendant's fear that plaintiff will ask questions to elicit irrelevant personal opinions from Barish as opposed to professional opinions.

This author is also aware of his professional responsibilities and will conduct the questioning in conjunction with the FRCP 803(4) and Barish's professional opinions relating to same. This author has no intention of asking Barish if plaintiff was the victim of crime or whether she hopes plaintiff will win her lawsuit.

Barish's testimony will go to her treatment of plaintiff and whether plaintiff had a subjectively genuine belief that she was a victim of harassment and emotional residuals related thereto.


## **OTHER PROPOSED PRECLUDED TESTIMONY BY DEFENDANTS**


### "That's Sexual Harassment" Comment made by Dan Jacobson, manager

Defendants move to preclude this testimony based upon it being Hearsay. FRE 802.   The context in which the statement was made, which includes Mr. Jacobson's physical reaction while making the statement fall within multiple exceptions to the hearsay rule.  This statement may be admitted under FRE 803(1) – present sense impression, FRE 803(2) – excited utterance, and FRE 803(3) – then existing mental, emotional, or physical condition.

Ms. Sammarco testified that after she told Dan Jacobson that Gary Anthony Ramsey attacked her, he "tightened up, his fists were hitting the computer keys. He just tightened up as if

he atrophied. And he emphatically said "That is sexual harassment!"". (See Declaration of Andrew C. Laufer, Exhibit A  pg. 302 line 14-25.)

Clearly, this is a "statement describing or explaining an event…".  See FRE 803(1).  It can also be construed as an "excited utterance" since it seemed that Mr. Jacobson became very emotional and blurted out, "That is sexual harassment!" after Ms. Sammarco told  him what Ramsey did to her.  See  FRE 803 (2).

It can also be construed as a statement "of the declarant's then existing state of mind, emotion, sensation, ….." which would make it admissible under FRE 803(3).

Furthermore, Mr. Jacobson was a part of NY1 management so it is a question of fact whether or not he was involved in this decision making process.  Moreover, this statement by Jacobson was made while at the workplace.  This statement also falls within the Hearsay exception of FRE 801(d)(2)(A) and (D) which allows the admissibility of statements by a party opponent in a "representative capacity" or a statement made by a "party's agent".

Moreover, the incident with Ramsay and the plaintiff, while occurring after a news industry party at Café Iguana hosted by Channel 41 and 47, still binds the employer because it was a news industry event and Ramsay's sexual overtures were a continuation of the industry event.

Furthermore, Ramsay, as well as all on air talent, have knowledge of the scrutiny under which they must conduct their inter-office relations due to a morality clause within all on-air talent contracts including Ramsay's contract In sum and substance, the clause states that on-air talent "shall not engage in any activity, either on or off duty, which may bring NY1 into a negative light."  (See Laufer Declaration Ex B pg. 9 line 2-16.)

<u>Comment About NY1 Intern Who "Fled" the Station by David Kern</u>

As to the comments involving an intern named "Kristin" made by David Kern, referring to Gary Anthony Ramsay inappropriate sexual relationship with the intern it becomes admissible because Ramsay already testified as to the truth of the matter.  At his deposition, he testified that sexual relationships with NY1 employees were allowed.  When asked, if he ever have a sexual relationship with any female interns, he responded "Yes". According to Mr. Ramsay "Kristen" was a "military brat" that lived in both "Cincinnati Ohio" and "London".  His sexual relationship with Kristen ended when her internship ended.  (See Declaration of Andrew C. Laufer, Ex. B pg. 38-40.)

Clearly, any information regarding his sexual relationship with an intern is probative as to the atmosphere and tolerance by NY1 management of sexual relationships between employees and subordinates.  It is clear that they had no standards whatsoever.  Defendants claim that this relationship was "consensual", however this demonstrates the lack of judgment and lack of policies and procedures established by human resources.  See <u>Gonzalez v. Digital Equipment Corp, supra</u> and <u>Carter v. Hewitt</u>, supra.

<u>Ramsay Arrest</u>

The Plaintiff consents to the preclusion of the Ramsey Arrest for an altercation with New York City Police Officers.

<u>Circumstances of Ramsay's Separation from NY1</u>

Plaintiff wishes to present evidence regarding the circumstances leading to Ramsay's termination from NY1.  Mr. Ramsay was terminated for material misrepresentations made on the air through an intentional impersonation of a person making a call to an open NY1 talk show. He called into "The Call" a NY1 talk show hosted by John Sciumo, and stated his name was "Dalton from the Upper East Side of Manhattan."  (See Declaration of Andrew C. Laufer, Ex. C.)

"Evidence of bad character is normally admissible in civil case to impeach a witness, and may also be used in those cases in which person's character is directly in issue as matter of substantive law." <u>Conley v. Meeker</u>, 85 N. Y. 618; <u>Spira v. Holoschutz</u>, 38 Misc. 754, 78 N.Y.S. 1138; Richardson, Evidence § 495 [10th ed, Prince]; Fisch, New York Evidence § 453 [2d ed]; Proposed Code of Evidence, Comment, § 608[a]).  See also <u>Kravitz v. Long Island Jewish-Hillside Medical Center</u> N.Y.A.D. 2 Dept., 1985.

Mr. Ramasay's conduct is exactly the type of evidence the courts allow parties to use to place in to question the truth and veracity of a witness.


<u>Circumstances of Carter's Conviction and Separation from Employment</u>

The Plaintiff consents to the preclusion of Carter's conviction for spousal abuse and his subsequent firing from NY1.


<u>Proposed Testimony of Jeff Simmons and Melissa Russo by the Plaintiff</u>

Plaintiff consents to the preclusion of testimony from the plaintiff herself as to the comments made by Simmons and Russo, "Well, Steve said it's not pushing the envelope" and "knew Steve would get into trouble one day", respectfully.

<u>Testimony Concerning Consensual Conduct</u>

There has already been testimony from Jeff Carey, a former employee of NY1 that he witnessed Steve Paulus place his hand on Rose Del Castillo's thigh in the news room.  Steve Paulus also testified that he called Rose Del Castillo late at night.  This evidence substantiates that there were no policies and procedures that were followed or enforced by human resources at NY1 relating to sexual conduct between management and subordinates. This conduct is also in violation of the NY1 sexual harassment policies contained in its Employee Information Handbook which prohibits conduct which has the effect of creating an offensive working environment. (See Declaration of Andrew C. Laufer, Ex. D pg. 64 line 4 and pg. 65 lines 9-13 and Ex. E pg. 43 lines 2-5).


<u>Testimony related to Alleged Harassment that the plaintiff did not witness of which she was the subject.</u>

The plaintiff's breast size was compared by Steve Paulus to other female employees at a NY1 Christmas Party.  He also asked news assistants who they would rather sleep with. This was independently confirmed by Jeff Carey and other witnesses that the plaintiff intends to call.

Plaintiff expects to call Jeff Carey and other witnesses to substantiate statements made by Steve Paulus at a NY1 Christmas Party in which the breast sizes of the female reporters were discussed.   The statements were repeated to Ms. Sammarco.  The plaintiff will testify as to the emotional consequences of the actions.   (See Declaration of Andrew C. Laufer, Ex D pg. 105-106.)

<u>Statements told to John Miller, Dennis Sheehan, and Richard Emery Regarding the Plaintiff being Blackballed are admissible</u>

Again, statements regarding whether a person was "blackballed" within his profession have been held not to violate the hearsay laws.

In <u>Ronde V. Gaytime Shops Inc</u>, 239 F.2d 735 (2nd Cir 1956). The court found admissible the plaintiff's testimony that he was told by a prospective employer that he was "black balled by your last employer" and was refused the job.

Defendants objected to the evidence as hearsay, offered to prove the motive of employers.  The court overruled the objection.

The Court Stated:

The testimony was offered to prove the motive of these prospective employers if hearsay, it comes within a well defined exception to the rule , <u>Lawlor v. Loewe</u>, 1915, 235 U.S. 522, 536 35 S. CF. 170, 59 L.FD 341; Wigmore, Evidence &1729, vol. VI (3rd Edition), although some authors would not even consider this as hearsay . Richardson &211 (FR Edition, Prince).


<u>Testimony by Plaintiff Concerning Incidents Involving Landis at His Prior Employer</u>

The plaintiff consents to the preclusion of this testimony.


<u>Testimony and Other Evidence Concerning Sammarco's Alleged Lost Wages Following her Resignation from Her Subsequent Employment</u>

Defendant's attack on Plaintiff's back and front pay claims by looking to strike the claim for damages arising after 2004 is based on inaccurate representations.

The allegation that Ms. Sammarco voluntarily resigned from The Council on the Arts and Humanities For Staten Island (COAHSI) is mischaracterized.   Ms. Sammarco continued her

work at the Council on the Arts until early 2006, which is located on the Snug Harbor Cultural Center Campus, when she was then offered a $20,000.00 raise to act as the Director of Marketing and Public Relations for the entire eighty-three acre Snug Harbor Cultural Center Campus.

"A discharged employee must 'use reasonable diligence in finding other suitable employment,' which need not be comparable to their previous employment."  Greenway v. Buffalo Hilton Hotel, 143 F. 3d 47, 54 (2d Cir. 1998) quoting Ford Motor Co. v. EEOC, 458 U.S. 219, 231 & n. 15, 102 S. Ct. 3057, 73 L. Ed. 2d 721 (1982).  See also Watson v. E.S. Sutton, Inc., 2005 WL 2170659 (SDNY).

Ms. Sammarco used reasonable diligence in finding substitute employment since she was unable to obtain employment within the news industry.  Furthermore, she has a good faith basis for leaving the Council on the Arts since she was offered a higher paying job.


The Fever Pitch Videotape and Related Testimony

The evidence of a video tape left in Ms. Sammaro's mailbox at work which on the cover depicted a topless woman with soccer cleats covering her breasts is clearly relevant and non-prejudicial.  When she took it out of her mailbox, someone yelled "You need to get laid!".  It is relevant and material to the claim that plaintiff suffered from a sexually hostile work environment.  (See Declaration of Andrew C. Laufer, Ex. A pg. 337 line 19-25.)

Merely because this is harmfully evidence for the defense does not make it inadmissible. See  Fed.Rules Evid. Rule 403, 28 U.S.C.A.  See Carter v. Hewitt 617 F.2d 961, 5 Fed. R. Evid. Serv. 1184 C.A.Pa., 1980.

Furthermore, the statement "You need to get laid!" is admissible under hearsay exception 803 (1) present sense impression.  It is what the plaintiff observed firsthand.

The Decision of the Administrative Law Judge of the New York State Unemployment Board

Plaintiff consents to the preclusion of this information.

Community Awards and Relevant Compliments

All of these awards are related to and in recognition of Ms. Sammarco's work and therefore they are relevant.  It is up to a jury to determine the weight of the evidence. See FRE 401 and 402.

The Sample Reels of Plaintiff's On-Air Appearances

During a status conference with Magistrate Judge Azrack, the defendants objected to what would have been over 50 hours of Ms. Sammarco's Anchoring and Reporting.  Therefore, the parties mutually agreed that the plaintiff's would produce a sample reel of Ms. Sammarco's work and exchange it with the defendants.  The plaintiff then, through great time and expense, pared down Ms. Sammarco's original video reel and reporting to a mere half hour.  We believe that defendants motion addressing this issue is in bad faith and frivolous since they agreed to this in open court.

Instant Messages

Defendants seek to preclude various inter-office messages between the plaintiff and managers at NY1 designated as PX 22.  Contrary to defendant's allegations, these emails clearly

identify Anne Munkenberg (Editor to Entire News Room), Enez Paganuzzi (Assignment Editor), and Dan Jacobson (Managing Editor) as the originators of said messages and Ms. Sammarco as the recipient.  (See Declaration of Andrew C. Laufer, Ex G)

Furthermore, they refer to a Blooper reel of which Ms. Sammarco was the subject of. These statements fall within the Hearsay exception of FRE 801(d)(2)(A) and (D) which allows the admissibility of statements by a party opponent in a "representative capacity" or a statement made by a "party's agent".

## <u>CONCLUSION</u>

For the reasons stated herein, the plaintiff respectfully requests the court deny defendants requested relief and for any other purpose the court deems just and proper.

Dated:          New York, New York
                March 22, 2010

Respectfully submitted:

_electronic signature_____
Law Office of Andrew C.
Laufer, PLLC
Andrew C. Laufer


_electronic signature_____
Tacopina, Seigel, & Turano, P.C.
Joseph Tacopina

_electronic signature_____
Popick, Rutman, & Jaw, LLP
Rick Rutman